WELCH, Judge.
 

 Westly Devone Harris
 
 [1]
 
 was convicted of two counts of murder made capital for the killings of Mila Ruth Ball and John Ball because the killings occurred during the course of a burglary, a violation of § 13A-5-M0(4), Ala.Code 1975; two additional counts of murder made capital for the deaths of Joanne Ball and Tony Ball because the killings occurred during the course of a burglary; and one count of murder made capital because the six victims in this case — Mila Ruth Ball, Willie Haslip, Joanne Ball, Jerry Ball, Tony Ball and John Ball — were killed pursuant to one scheme or course of conduct, a violation of § 13A-5^0(10), Ala.Code 1975.
 

 After the penalty phase of the trial, the jury recommended by a vote of seven to five that Harris be sentenced to life in prison without the possibility of, parole. Subsequent to the jury’s recommendation, the trial court ordered a presentence report. A sentencing hearing was held, after which the trial court overrode the jury’s recommendation and sentenced Harris to death.
 

 The evidence adduced at trial tended to show the following. Mila Ruth Ball, 65, was the matriarch of a family that lived on a farm in Moody’s Crossroads in Crenshaw County. Her daughter, Joanne, 35, was married to Willie Haslip, 40; they lived in a trailer on the farm with their three sons, Jerry Ball, 19, Tony Ball, 17, and John Ball, 14. Joanne and Willie also had a daughter, Janice Ball, 16, who lived with her grandmother Mila Ruth in the house at the farm.
 

 Janice was 14 years old when she met then-19-year-old Harris. Three months after the two met, Janice became pregnant, and the two had a daughter, Neshay, whom they called “Shay.” Janice testified that when she told Harris she was pregnant, she did not see him much until Shay was born. Then, Janice said, she and Harris lived together in a trailer in Luverne. Harris became “violent,” Janice said, so she moved back home to the farm and lived with her grandmother in the house. (R. 7421-22.)
 

 Her father, Willie, then bought a trailer and put it on the farm because, Janice said, he wanted her and Harris “to stay together for he wanted him to kind of take care of his own baby and just have a family together.” (R. 7422.) Janice testified that she and Harris lived together in the trailer her father had bought “off and on” because Harris was “still violent and controlling.” (R. 7423.)
 

 On Friday, August 23, 2002, Janice said, she and Harris were in the trailer Willie had bought for them. Janice asked Harris
 
 *889
 
 to pay her back some money he had borrowed from her so that she could buy Shay some diapers. Janice said Harris refused to give her any money and slapped her. She threw a telephone at him and told him to pack his belongings and leave.
 

 Their argument took them outside, where Janice’s brother Jerry saw them. He got a shotgun for Janice, and she admitted that she held the gun on Harris, but then gave it back to Jerry. Harris left the farm that night. Janice stayed in Mila Ruth’s house.
 

 The next day, Saturday, Harris called Janice at the McDonald’s restaurant where she worked and asked her whether her family planned to press charges against him. Janice did not answer his question. On the following day, Harris again called Janice to see whether she or her family were planning to press charges against him. Again, Janice did not answer his question.
 

 That evening, Harris came back to Mila Ruth’s house at the Ball farm to speak with Janice. Janice said that Harris sat on the porch while she stayed inside the house and talked with Harris through the screen door. Janice said she then went to the bedroom to tell Mila Ruth that Harris was there. Mila Ruth went to the door and told Harris she was going to have him arrested and that she was going to call Janice’s father over. Harris started backing up, Janice said, and told Mila Ruth “that he didn’t want any trouble.” (R. 7444.) Mila Ruth called Willie, and he, Joanne, and Janice’s brothers Jerry and John came over to Mila Ruth’s house from their trailer. Janice said Willie and Jerry had shotguns with them. Harris had already left the porch, but Willie shouted out for him to leave the farm before he got hurt. (R. 7444.) Harris left the farm, and Janice and her family went back inside their respective homes and went to bed. Janice shared a bedroom with Mila Ruth.
 

 The next morning, Monday, Janice awoke about 8:30 when her bed was shaking. Shay was in bed with her. Janice said she heard the lock on the kitchen door, then heard some mumbling that she could not make out. Then, she said, she saw her grandmother, Mila Ruth, “walking back into the bedroom and Westly [Harris] had a shotgun pointed to her stomach.” (R. 7449.)
 

 Harris made Janice and Mila Ruth move into the kitchen and made Mila Ruth get on the floor. He handed Janice a roll of tape and told her to use it to tie Mila Ruth’s hands. Janice said after she finished, Harris snatched the tape away from her and, while resting the gun between his legs, he tied Mila Ruth’s hands tightly with the tape. Harris told Mila Ruth that “it was going to be a lot better without her now.” (R. 7451.) Harris then taped Janice’s hands together.
 

 Harris told Mila Ruth that she needed to say her prayers. As Mila Ruth began saying the Lord’s prayer, Harris shot her in the face with a shotgun.
 

 Harris made Janice go back to the bedroom, and he bound her to one of the beds with a telephone line and an extension cord. He placed some toys on the bed for Shay and put Shay up on the bed with Janice. He then asked Janice what time her brother Tony usually got up and came over to Mila Ruth’s house. Janice told him that Tony usually came over about noon or 12:30 p.m. Tony was the only other person at the farm at that time.
 

 Harris left Mila Ruth’s house. Janice said she heard the shotgun go off again, then she heard the front door to the house open. Harris came into the bedroom, cocked the shotgun so that a shell came out, then threw it on Janice, saying, “That
 
 *890
 
 was your brother.” (R. 7466.) Evidence showed that Tony died of a gunshot wound to the back of his head while he was still in bed.
 

 After shooting Tony and coming back into Mila Ruth’s house, Harris took Shay into the living room of Mila Ruth’s house and watched television. Janice was still tied to the bed. She said Harris would come check on her periodically and told her he would not hurt her if she “didn’t try nothing stupid.” (R. 7467.)
 

 At about 3:30 that afternoon, Janice said, she heard her brother Jerry’s car pull up in the yard. As usual, Jerry had brought John home from Luverne Middle School, then went back to work. Janice was still tied up on the bed and, by this time, Harris had gagged her with a towel. Harris left Mila Ruth’s house, but then Janice heard the door open again and she heard Harris say, “Get over there.” (R. 7472.) The shotgun went off again, and Janice heard something fall.
 

 The evidence indicated that, when Jerry pulled away after dropping off John, Harris went over to the trailer where John lived. The State posited that John put up a fight with Harris because his autopsy showed that he had suffered two gunshot wounds from the pistol, one of which lodged in his spine and would have caused paralysis. After shooting John twice, Harris somehow got John back to Mila Ruth’s house, where John was shot once in the eye with a shotgun. John’s body was discovered next to Mila Ruth’s in the kitchen at Mila Ruth’s house.
 

 About 4:00 p.m., a half-hour after John was killed, Janice said, she heard her father’s pickup truck pull up in the yard. She said she watched through the window as Willie drove to the back of the yard. Harris was in the room with her. He had told Janice he would kill her if she tried to warn Willie. When the truck went by, Janice said, Harris took a shotgun and a pistol and left the house. She said she did not hear a gunshot, but she did hear the truck start again. It pulled up next to her grandmother’s house and stopped, then Harris came back inside holding a shotgun.
 

 Haslip’s body was discovered under a piece of metal in the hog pen. He, too, had been shot in the face with a shotgun.
 

 After shooting Haslip, Harris came back into Mila Ruth’s house and cut the bonds holding Janice to the bed. He told Janice to get Shay a bottle and a pacifier, then had them climb out the bedroom window. Harris was still carrying a shotgun, and he told Janice he would shoot her if she tried to run. Janice said she did not try to get away when Harris climbed out the window because she was holding Shay. Harris led Shay to the trailer where her parents and brothers lived.
 

 At about 5:30 or 5:45 that evening, Janice said, her mother, Joanne, came home. Harris told Janice that if she tried to warn her mother, he would shoot Janice. Harris, armed with a shotgun, sat down in a chair that would be behind the front door when the door was opened. When Joanne came into the trailer, Janice said, she saw Harris, looked at Janice, then walked into the living room. She asked Janice where Tony was, and Harris told her to get on her knees. Joanne looked at Harris and said, “Fuck you.” (R. 7482.) Joanne took a step toward Janice, again asked where Tony was, and Harris shot her. The shot hit Joanne in the back of the neck. She turned and tried to run for the door but Harris got up and shot her again from behind. He then propped the shotgun on the inside wall of Joanne and Willie’s bedroom and dragged Joanne into the room.
 

 Harris spent some time trying to clean the blood from the living room floor before
 
 *891
 
 Jerry came home. He also began taking items like a radio, speakers and an amplifier from Janice’s parents’ closet. He also took Willie’s wallet and telephone from Willie’s body as it lay in the hog pen. Janice said Harris packed the belongings into her mother’s car, a red Grand Am. She was with him as he walked around the yard and packed the car.
 

 At one point, Harris told Janice to go behind the trailer. She said she was on the side of the trailer when Jerry pulled into the yard in his car. Harris hid the shotgun behind his back as Jerry got out of the car. Harris asked Jerry to take him to the store. Janice said that she heard Jerry say something, then the shotgun went off again. She came out from behind the trailer and saw Jerry running up the porch toward the door. Jerry called her name as he was reaching for the door, then Harris shot him again. Jerry was shot once in the chest and once in the head.
 

 Harris put Jerry’s body in the trunk of Jerry’s car. Harris then tried to clean up the blood on the porch and had Janice scoop up dirt from the yard and use it to try to cover the blood.
 

 Harris put clothes and other cloths he had used to try to clean the blood from Jerry and Joanne’s wounds into a garbage bag, then put the bag into the trunk of the car with Jerry’s body. He closed the trunk and moved the car out of the front yard and into the hog pen. He also moved Willie’s truck and then Joanne’s truck into the pen. Janice said Harris kept the gun with him while he moved the vehicles.
 

 Afterwards, Janice said, Harris made her hand him the shotguns and pistol as he put them in the trunk of the Grand Am. He also made Janice pack a backpack for her and Shay into the trunk. He threatened to shoot the family’s white bulldog, which had blood all over it, but Janice told him not to kill it. Harris put the dog into the trunk as well, then he, Janice and Shay left the Ball farm in the Grand Am.
 

 Harris, Janice and Shay then began a three-day odyssey traveling around Cren-shaw County. Their first stop was at a service station in Luverne, where Harris sent Janice inside to buy snacks while he pumped gas. Janice said she did not seek help from anyone inside the service station because, she said, since he had just killed her entire family, she was afraid Harris would kill others if she sought help from them.
 

 Harris then drove to the home of his cousin, Andre “A.J.” Robinson in Luverne. Robinson testified that Harris gave him two shotguns. He said there was also a white bulldog in the car’s trunk, which Harris left with him. A few days later, Robinson said, a friend of his told him to get rid of the guns, so he threw them in the woods, where law-enforcement officials recovered them. Harris also sold three shotguns to an acquaintance, Wendell Edwards.
 

 Harris next went to Dozier, where he met briefly with his friend Jarvis “Jabo” Scanes. Harris then went to see his closest friend, Greg Daniels. Harris gave Daniels three guns, which Daniels hid in the woods near his house. Daniels testified that Harris told him he had “offed” the Ball family. (R. 6847.) Janice said she did not seek help from either Scanes or Daniels because they were friends of Harris’s and she was wary of them.
 

 After leaving Daniels, Harris drove to Andalusia to the home of his friend Leon and Leon’s sister, Kiki. Janice said that at about daybreak, she and Shay were able to sleep for a while at Leon’s house, and she and Harris both cleaned up.
 

 After leaving Leon’s house, Harris went back to Luverne, Rutledge, and Dozier, where he stopped at other friends’ houses.
 
 *892
 
 Again, Janice said she never sought help because every place they stopped, they were with Harris’s friends and she believed they would be more inclined to help Harris than to help her.
 

 Harris, still driving the red Grand Am, eventually drove to a club, Cole’s Lounge, near Rutledge. Harris broke into the club, and he, Janice and Shay stayed there for two days. During that time, Harris’s aunt persuaded him to turn himself over to law-enforcement officials. Agents from the Alabama Bureau of Investigation (“ABI”), accompanied by Harris’s aunt, went to Cole’s Lounge and picked up Harris, Janice and Shay. They were then taken to the Lowndes County Sheriffs Office.
 

 I.
 

 Harris contends that the trial court abused its discretion in admitting statements he made to law-enforcement officials that he claims were obtained from him in violation of his constitutional rights. He asserts several bases for his contention.
 

 A.
 

 Harris first claims that the prosecution did not meet its burden of showing that he was properly advised of his rights pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before he gave statements to law-enforcement officials. Specifically, Harris asserts that the prosecution failed to demonstrate that he had been advised of his
 
 Miranda
 
 rights before being questioned by Agent Dave Watson of the ABI, to whom Harris provided his sneakers. Upon Harris’s motion to suppress his statement’s to law-enforcement officials, the trial court held a suppression hearing to determine whether law-enforcement officials advised Harris of his
 
 Miranda
 
 rights and to determine whether Harris’s statements had been made knowingly and voluntarily.
 

 “ ‘The trial court held the suppression hearing outside the hearing of the jury; therefore, we review the evidentiary findings of the trial court at that hearing under the
 
 ore tenus
 
 standard.’
 
 Ex parte Jackson,
 
 886 So.2d 155, 159 (Ala.2004). ‘When evidence is presented
 
 ore tenus
 
 to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,’
 
 Ex parte Perkins,
 
 646 So.2d 46, 47 (Ala.1994); ‘[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,’
 
 Bradley v. State,
 
 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala.1986); and we make ‘ “all the reasonable inferences and credibility choices supportive of the decision of the trial court.” ’
 
 Kennedy v. State,
 
 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting
 
 Bradley,
 
 494 So.2d at 761. ‘ “ Where evidence is presented to the trial court
 
 ore tenus
 
 in a nonjury case, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.’ ” ’
 
 Ex parte Jackson,
 
 886 So.2d at 159, quoting
 
 State v. Hill,
 
 690 So.2d 1201, 1203 (Ala.1996), quoting in turn
 
 Ex parte Agee,
 
 669 So.2d 102, 104 (Ala.1995).
 

 “However, ‘[t]he
 
 ore tenus
 
 presumption of correctness applies to findings of fact, not to conclusions of law.’
 
 City of Russellville Zoning Bd. of Adjustment v. Vernon,
 
 842 So.2d 627, 629 (Ala.2002). ‘[T]he ore tenus rule does not extend to cloak a trial judge’s conclusions of law, or incorrect application of law to the facts, with a presumption of correctness.’
 
 Eubanks v. Hale,
 
 752 So.2d 1113, 1144-45 (Ala.1999). ‘ “ ‘[W]hen the trial
 
 *893
 
 court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.’ ” ’
 
 Ex parte Jackson,
 
 886 So.2d at 159, quoting
 
 Hill,
 
 690 So.2d at 1203, quoting in turn,
 
 Ex parte Agee,
 
 669 So.2d at 104. Thus, we review the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.”
 

 Washington v. State,
 
 922 So.2d 145, 157-58 (Ala.Crim.App.2005).
 

 In this case, the evidence adduced during the suppression hearing indicated that the form used by Agent Watson demonstrating that he had advised Harris of his
 
 Miranda
 
 rights showed two different times as to when those rights were given to Harris. The first time listed on the form, 8:30 p.m., was marked out and 7:54 p.m. was written in its place. Both Watson and Harris initialed the change.
 

 Watson testified that he was not wearing a watch when he noted the times, and he changed the time when he realized he had made a mistake. He could not recall the timepiece he saw when he discovered his mistake, i.e., whether it was the office clock, his cellular telephone or a radio, but he noted the proper time when he discovered the correct time.
 

 Likewise, on Harris’s written statement, the time the statement was made was shown initially as 8:55 p.m. Watson testified that that time, too, was incorrect, and he changed the start time to 7:55 p.m. He did not have Harris initial that change.
 

 Harris contends that because Watson wrote incorrect start times on the
 
 Miranda
 
 form and again on Harris’s written statement, the prosecution was unable to meet its burden of showing with “clarity and precision” that Harris was advised of his rights before being questioned. However, Harris relies upon the changed times as reflected on the forms and ignores Watson’s testimony regarding the chronology of events leading up to Harris’s initial statement to him.
 

 Watson acknowledged in both the suppression hearing and at trial
 
 [2]
 
 that he had incorrectly recorded the start times on both the
 
 Miranda
 
 form and Harris’s statement. Watson testified that when Harris was first brought into the Lowndes County jail after being picked up at Cole’s Lounge, Watson was present at the jail and read Harris his
 
 Miranda
 
 rights. Watson was not the lead investigator in the case, so he was not going to conduct the in-depth questioning of Harris. He was merely waiting with Harris for Agent Raymon Smith to arrive and begin the interrogation.
 

 Watson said after he read Harris his rights, Harris began writing a statement, then stopped and put the pen down. Watson asked whether Harris wanted him to finish the statement, and Harris indicated that he did. Watson said he and Harris talked generally for about 20 minutes, then Harris asked to see Janice and Shay. Harris told Watson he would “tell the whole story” after talking with Janice. (R. 417; 6782.)
 

 Watson said that because Harris had been cooperative to that point, he allowed Harris to go into another room and talk with Janice. Their conversation lasted about 20 minutes. Because of the break, Watson said, when Harris returned Watson again advised him of his
 
 Miranda
 
 rights, then the two of them had a general
 
 *894
 
 conversation for another 20 minutes. Watson read from the statement that at 9:07 p.m., he asked Harris explicitly whether he had killed Willie Haslip. At that point, Watson said, Harris took off his sneakers — Nike Airs — and told Watson to take them, that they “would prove everything.” (R. 422; 6784.) Harris then started asking Watson what would be done with him and if he pleaded guilty, how long he would live. Other than handing Watson his sneakers and saying they would prove everything, Harris never spoke with Watson about the murders, and he did not confess to Watson.
 

 In support of his contention that the State failed to show he was properly advised of his rights, Harris cites
 
 Ex parte Price,
 
 725 So.2d 1063, 1067 (Ala.1998), which held that, to satisfy its burden of proving that an extrajudicial statement or confession was voluntary, the State must show by a preponderance of the evidence:
 

 “(1) that proper
 
 Miranda
 
 warnings were given before any questioning by the police and (2) that the statement was voluntary, i.e., that it was not procured through coercion or improper inducement. See
 
 Stariks v. State,
 
 572 So.2d 1301, 1304 (Ala.Crim.App.1990);
 
 McLeod v. State,
 
 718 So.2d 727, 729 (Ala.1998). The initial determination of admissibility is made by the trial court, and the trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong.
 
 McLeod,
 
 supra;
 
 Stariks,
 
 supra.”
 

 The
 
 Price
 
 Court also noted that,
 

 “[although there is no talismanic incantation required to satisfy the requirements of
 
 Miranda,
 
 it is well settled that,
 
 before being questioned,
 
 an accused in custody must be informed in clear and unequivocal terms that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to have counsel present at the interrogation, and that if he is indigent and cannot afford to pay a lawyer, the court will appoint one to represent him during the interrogation. See
 
 Ex parte Siebert,
 
 555 So.2d 780, 781-82 (Ala.1989), citing,
 
 California v. Prysock,
 
 453 U.S. 355, 359-60, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981);
 
 Wallace v. State,
 
 290 Ala. 201, 275 So.2d 634 (1973).”
 

 Price,
 
 725 So.2d at 1067 (emphasis added).
 

 Despite the changes in the times noted on the
 
 Miranda
 
 form and Harris’s statement to Watson, which may have introduced some confusion as to the time line of events, Watson’s testimony provides sufficient evidence to explain why the noted discrepancies occurred, and he gave a full accounting of the chronology of events leading to Harris’s decision to give his shoes to Watson. The trial court’s finding that Harris had been advised of his rights before he attempted to begin writing a statement and twice before turning his shoes over to Watson is supported by a preponderance of the evidence.
 

 B.
 

 Harris also contends that the statements he made to police were involuntary because, he says, they were obtained through illegal inducement. Specifically, Harris asserts, his statements to police were made in exchange for Watson’s allowing Harris to speak with Janice and to see his daughter, Shay, and were, therefore, improperly induced.
 

 “ ‘It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency.
 
 Bram v. United States,
 
 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In
 
 Culombe [v. Connecticut
 
 ], 367 U.S.
 
 *895
 
 [568,] 602, 81 S.Ct. [1860,] 1879 [ (1961) ], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, “if his
 
 will has been overborne
 
 ” by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence.
 
 Id.
 
 (emphasis added).
 

 “ ‘The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the “totality of the circumstances.”
 
 Boulden v. Holman,
 
 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969);
 
 Greenwald v. Wisconsin,
 
 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see
 
 Beecher v. Alabama,
 
 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See
 
 Ex parte Matthews,
 
 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992);
 
 Jackson v. State,
 
 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him);
 
 Eakes v. State,
 
 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is “whether the defendant’s will was
 
 overborne
 
 at the time he confessed”) (emphasis added). Thus, to determine whether McLeod’s confession was improperly induced, we must determine if his will was “overborne” by an implied promise of leniency.
 

 [[Image here]]
 

 “ ‘... Thus, the test of involuntariness of a confession, or other inculpa-tory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant’s will was overborne by “apprehension of harm or hope of favor.” See
 
 [Ex parte
 
 ]
 
 Gaddy,
 
 698 So.2d [1150] at 1154 [ (Ala.1997) ] (quoting
 
 Ex parte Weeks,
 
 531 So.2d 643, 644 (Ala.1988));
 
 Culombe,
 
 367 U.S. at 602, 81 S.Ct. at 1879;
 
 Jackson,
 
 562 So.2d at 1380. To determine if a defendant’s will has been overborne, we must assess “the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure”; “[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.”
 
 Jackson,
 
 562 So.2d at 1380-81 (citations omitted).’
 

 “McLeod v. State,
 
 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).”
 

 Jones v. State,
 
 946 So.2d 903, 915-916 (Ala.Crim.App.2006).
 

 In this case, the evidence shows that, while engaged in a general conversation with Watson, Harris asked to see Janice and Shay. He told Watson that after he talked with Janice, he would give Watson the whole story of what had happened. There is no evidence indicating that Watson broached the subject of letting Harris see Janice. Instead, the evidence is undisputed that Harris made the request to see Janice and Shay, and then told Watson of his own volition that he would tell the whole story when he came back from seeing them. There is no evidence indicating that Watson placed any
 
 *896
 
 conditions on Harris when he went to see Janice, such as allowing Harris to see Janice and Shay in exchange for a statement. In short, there was no bargain made with police before Harris gave statements to them. As Watson testified, he granted Harris’s request to see Janice because Harris had been cooperative up to that point. There is no suggestion of a promise of leniency to Harris if he provided police with a statement or confession.
 

 There is simply no evidence to support a finding that Harris was under any kind of pressure from law enforcement when he gave his statement to Watson or later, when he gave a second statement to Agent Smith, or the following day, when he gave a third statement to AJBI Agent Johnny Tubbs. Indeed, Harris does not even contend that the latter two statements were the products of improper inducement.
 

 Based upon our review of the totality of the circumstances surrounding Harris’s statements, we find there is simply no evidence that Harris’s will was overborne or that law-enforcement officials improperly induced him to make statements based upon promises of leniency, hope of a favor, or any other reason that would constitute an inducement such as to render his statements involuntary. Accordingly, we hold that the trial court did not abuse its discretion in allowing Harris’s statements to law enforcement into evidence.
 

 C.
 

 In his reply brief, Harris further argues that the statements should have been suppressed because, he says, they were the fruit of an illegal arrest.
 

 It is well settled that “an appellant may not raise a new issue for the first time in a reply brief.”
 
 Woods v. State,
 
 845 So.2d 843, 846 (Ala.Crim.App.2002). “As a general rule, issues raised for the first time in a reply brief are not properly subject to appellate review.”
 
 Ex parte Powell,
 
 796 So.2d 434, 436 (Ala.2001). However, that general rule does not apply in cases involving the imposition of the death penalty.
 
 Id.
 
 Because this is such a case, we review this issue for plain error. Rule 39(a)(2)(D), Ala. R.App. P.
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001).
 

 In this case, our first inquiry must be whether Harris had, in fact, been arrested at the time he made his statements to police. Watson testified that Harris had not been formally arrested at the time he was brought into the Lowndes County jail for questioning. Where there has not been a formal arrest, “an objective test is used to determine whether the suspect’s
 
 *897
 
 freedom of action has been restricted by the police in any significant manner.”
 
 Barksdale v. State,
 
 788 So.2d 898, 903 (Ala.Crim.App.2000) (citations omitted). “ ‘The only relevant inquiry is how a reasonable man in the suspect’s position would have understood his position.’ ”
 
 Id.,
 
 quoting
 
 Hooks v. State,
 
 534 So.2d 329, 348 (Ala.Crim.App.1987). The United States Supreme Court has long held that “[a] person has been ‘seized’ within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.”
 
 United States v. Mendenhall,
 
 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
 

 The evidence indicated that Harris had been handcuffed when he left Cole’s Lounge to be brought into the jail. More important, Watson acknowledged that Harris was not free to leave the jail. On appeal, the State does not argue that Harris was not under arrest. Even though Harris had not been “formally” arrested, his freedom was clearly restricted. Thus, he had been “seized” for purposes of a Fourth Amendment analysis, and law-enforcement officials were required to have had probable cause to restrict his freedom.
 

 “Probable cause to support a warrant-less arrest must exist at the time of the arrest.
 
 Davis v. State,
 
 507 So.2d 1023 (Ala.Crim.App.1986). Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime.
 
 United States v. Rollins,
 
 699 F.2d 530 (11th Cir.) cert. denied, 464 U.S. 933, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). ‘In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act....’
 
 Brinegar v. United States,
 
 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). ‘ “The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.” ’
 
 Id.
 
 ‘Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.’
 
 Cox v. State,
 
 489 So.2d 612 (Ala.Crim.App.1985). The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause.
 
 Stone v. State,
 
 501 So.2d 562 (Ala.Crim.App.1986). ‘ “[P]robable cause may emanate from the collective knowledge of the police ....’”
 
 Ex parte Boyd,
 
 542 So.2d 1276, 1284 (Ala.1989) (citations omitted).”
 

 Dixon v. State,
 
 588 So.2d 903, 906 (Ala.1991).
 

 Harris contends that at the time he was picked up at Cole’s Lounge and held at the Lowndes County jail, law-enforcement officials had no information that he was involved in the Ball family murders and, therefore, had no probable cause to arrest him. The record does not support Harris’s contention, however.
 

 At a pretrial hearing on Harris’s motion to suppress, the prosecution presented the following evidence regarding law enforcement’s basis for having probable cause to arrest Harris. At the time ABI agents went to Cole’s Lounge, where Harris was hiding, law-enforcement officials knew that the entire Ball family and Willie Haslip had been murdered, with the exception of
 
 *898
 
 Janice Ball and her daughter, Shay, both of whom were missing. They knew that Harris was Shay’s father. They had determined that Harris was with Janice and Shay, that they were traveling in Joanne Ball’s red Grand Am, and that Harris had given several guns to his friends. Law-enforcement officials also had determined that Harris was using Haslip’s cell phone to make calls to his friends and family.
 

 Deputy Ronnie White testified at the suppression hearing that Harris’s cousin, Cassandra Cole, said that Harris had told his best friend, Gregory Daniels, that he had “offed” the Ball family. White spoke with Daniels, who told him that when Harris stopped by Daniels’s house, Harris was nervous and told him that it “might be the last time he would ever get to see him.” (R. 2302.)
 

 While Harris was in hiding, he spoke by telephone to Deputy Robin Daniels. Daniels testified at the hearing that Harris told Daniels to ask Harris’s mother for some letters that Harris said would help law-enforcement officials understand why he did what he did. Later, Harris asked Deputy White whether he had read the letters. Harris then asked White what he would have done in light of the information contained in the letters, i.e., Janice’s alleged abuse at the hands of her father and brothers. Harris told White he thought White would have done the same thing he had done. (R. 2305-06.)
 

 Harris’s aunt Katie Mae Cole was working with law-enforcement officials in an effort to have Harris turn himself in. Harris himself had spoken with Sheriffs Deputy Ed Williams, telling Williams he was scared to turn himself in.
 

 Harris’s flight, coupled with the fact that he was known to be in possession of items taken from the Ball-Haslip home, and his comments to friends, family members and members of law enforcement certainly give rise to a probability that Harris had been involved in criminal activity. Law-enforcement officials had probable cause to arrest Harris. Therefore, the statements he made to police were not the fruit of the poisonous tree and were properly admitted into evidence.
 

 II.
 

 Harris contends that in striking the jury, the State violated the requirements of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and
 
 Ex parte Branch,
 
 526 So.2d 609 (Ala.1987). Harris asserts that when the trial court required the State to provide race-neutral reasons for its strikes of black venire-members, the State’s stated grounds for striking two black members of the veni-re — Z.S. and R.F. — were pretextual.
 

 In
 
 Batson
 
 the United States Supreme Court held that black venire-members could not be struck from a black defendant’s jury because of their race. “A defendant is required to make a ‘prima facie’ showing of racial discrimination before the trial court will review the prosecutor’s reasons for its strikes of black venire-members.”
 
 Batson,
 
 476 U.S. at 93-94, 106 S.Ct. 1712.
 

 “ ‘ “When explaining the basis for its peremptory strikes of blacks, the prosecution must offer a clear, specific, and legitimately race-neutral reason for each strike.”
 
 Sims v. State,
 
 587 So.2d 1271 (Ala.Crim.App.1991), cert. denied, [502] U.S. [1098], 112 S.Ct. 1179, 117 L.Ed.2d 423 (1992). See also
 
 Batson,
 
 476 U.S. at 98, 106 S.Ct. at 1724 (“the prosecutor must articulate a neutral explanation related to the particular case”).
 
 “[T]he removal of even one juror
 
 for a discriminatory reason is a violation of the equal protection rights of both the
 
 *899
 
 excluded juror and the minority defendant. Moreover, this is true even though blacks may be seated on the petit jury and there were valid race-neutral reasons for striking other blacks from the jury.’ ”
 

 “Carter v. State,
 
 603 So.2d 1137, 1138-39 (Ala.Crim.App.1992).”
 

 Pruitt v. State,
 
 871 So.2d 101, 103 (Ala.Crim.App.2003).
 

 “ ‘After race-neutral reasons have been articulated, the moving party can offer evidence showing that those reasons are really a sham or pretext.
 
 Ex parte Branch,
 
 526 So.2d at 625. On appeal, the trial court’s ruling on the question whether the responding party offered legitimate race-neutral reasons will not be overturned unless it is clearly erroneous.
 
 K.S. v. Carr,
 
 618 So.2d 707, 710 (Ala.1993), citing
 
 Ex parte Branch,
 
 526 So.2d at 622.’ ”
 
 Harrison v. State,
 
 879 So.2d 594, 607 (Ala.Crim.App.2003), quoting
 
 Ex parte Brooks,
 
 695 So.2d 184, 190 (Ala.1997). “The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.”
 
 Heard v. State,
 
 584 So.2d 556, 561 (Ala.Crim.App.1991). “‘A trial court’s ruling on a
 
 Batson
 
 objection is entitled to great deference, and we will not reverse the trial court’s ruling unless it is clearly erroneous.’ ”
 
 Pruitt v. State,
 
 871 So.2d at 103, quoting
 
 Giles v. State,
 
 815 So.2d 585, 586 (Ala.Crim.App.2000).
 

 “ ‘ “[A] finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.” ’
 

 “Davis v. State,
 
 555 So.2d 309, 312 (Ala.Crim.App.1989), quoting
 
 Powell v. State,
 
 548 So.2d 590 (Ala.Crim.App.1988).”
 

 Fletcher v. State,
 
 703 So.2d 432, 436 (Ala.Crim.App.1997).
 

 At the request of the trial court, prosecutors provided the following reasons for their strikes of Z.S. and R.F.:
 

 “MR. MAZE: [Z.S. and R.F.], along with white male juror number 89, [J.R.J.], all testified that they were preachers in their congregation. The State did not want to have any preachers on the jury in a death penalty case for the fear of what someone does for a living, to teach love, forgiveness, you just can’t tell, as far as pastors go, as to what their stance would be on the death penalty when it comes down to being in the jury room.
 

 “Therefore, the State intended to strike all three pastors. We had all three on our strike fist.
 

 “The defense struck [J.R.J.] with their fifth pick. And it was only after [J.R.J.] was struck that the State struck [R.F.] ■with their eighth pick.
 

 “Also, as for 164, [Z.S.], [Z.S.] during group panels stated that his neighbor or one of his neighbors that he spoke to was the defendant’s mother and sister. And we didn’t want somebody who lived near and spoke to the defendant’s mother and sister on the jury.”
 

 (R. 6233-34.)
 

 The trial court found the stated grounds for the strikes of Z.S. and R.F., among others not at issue on appeal, to be race neutral. This court has held that religious-based strikes of veniremembers are facially race neutral.
 
 Smith v. State,
 
 838 So.2d 413, 436 (Ala.Crim.App.2002) (expressly overruling
 
 Walker v. State,
 
 611 So.2d 1133 (Ala.Crim.App.1992) (determining that a prosecutor could not properly give as a reason for striking a potential juror the fact that the jury was very religious where there was no basis in the record for any assumptions drawn from that characteristic)), see also
 
 Coral v.
 
 
 *900
 

 State,
 
 628 So.2d 954 (Ala.Crim.App.1992) (a capital case in which the strike of a black minister’s wife was upheld where a white minister’s wife also was struck).
 

 The State’s proffered reason for striking Z.S. and R.F. is facially race neutral. The neutrality of its basis for their strikes is bolstered by the fact that the State also intended to strike a white pastor for the same reason, but it was unable to only because Harris struck that veniremember first. On the authority of
 
 Smith v. State,
 
 supra, we cannot say that the trial court’s ruling that the State’s strikes were racially neutral were clearly erroneous; thus, there is no basis for reversal as to this issue.
 

 III.
 

 Harris contends that the trial court’s override of the jury’s recommendation to sentence Harris to life in prison without the possibility of parole was arbitrary and unconstitutional. He asserts several bases for his contention.
 

 A.
 

 Harris first asserts that the trial court erred in ascribing “little weight” to the jury’s verdict recommending life in prison without the possibility of parole. The record shows that Harris’s characterization of the trial court’s consideration of the jury’s verdict is inaccurate in that he takes the words “very little weight” — which do appear in the sentencing order — out of context. (C. 515.)
 

 In its sentencing order, the trial court stressed that it considered the jury’s recommended sentence of life imprisonment as “the heaviest mitigator in this case,” (C. 516) and the court found numerous mitigating circumstances to exist.
 

 In its sentencing order, the trial court did an exemplary job of explaining its reasons for overriding the jury’s recommendation, by a vote of seven to five, that Harris be sentenced to life in prison without the possibility of parole. The court stated that, unlike the jurors in this case, it had resources outside of those available to the jury members that led it to a different conclusion as to what the appropriate penalty should be. The court stated that, when researching cases in which the trial court overrode the jury’s recommended sentence and imposed the death penalty, it had “seen no case in which six victims were killed in one scheme or course of conduct, but it ha[d] found cases involving multiple victims.” (C. 513-514.) The trial court then listed six cases decided since 2000 involving multiple victims in which the jury had recommended life in prison but in which the respective trial courts then overrode the juries’ recommendations and imposed the death penalty. In each case, the appellate courts upheld the trial court’s decision to override the recommended sentence. The court noted that each of the cases cited involved fewer than six victims.
 

 In balancing the aggravating and mitigating circumstances applicable in this case, the trial court found that the aggravating circumstances substantially outweighed the mitigating circumstances. The jury’s recommendation of life in prison without the possibility of parole baffled the trial court. In its order, it stated that “[biased on the overwhelming evidence in this case and the unanimous verdicts on all five counts of capital murder, it is not easy to discern why seven members of the jury voted against the death penalty in this case.” (C. 509.) In an effort to reconcile the unusual violence of the crime with the recommended sentence, the trial court set forth possible reasons it thought might explain the jury’s recommendation for a life sentence for a defendant it had found
 
 *901
 
 had killed six members of one family over the course of a day.
 

 One possibility for the recommendation, the court noted, may have been that “several jurors’ emotions may have hindered their abilities to follow the law to impose the death penalty.” The court observed that “at least three jurors were openly weeping” when they returned to the courtroom to give their verdict during the guilt phase of Harris’s trial. Thus, the court said, “[i]t is very possible these jurors, although extremely cooperative, diligent, and attentive throughout the trial, were unable to carry out their sworn legal obligation during sentencing (as in
 
 [Ex parte
 
 ]
 
 Taylor,
 
 808 So.2d 1215 (Ala.2001) ]).” (C. 515.)
 

 The trial court also found that some jurors may have been “unwittingly led to believe that ‘residual doubt’ was a proper mitigator.” (C. 515-516.) “This Court holds that one or both of these matters were likely a key factor in the jury’s recommending a sentence of life without parole in the fact of the overwhelming weight of the aggravating circumstances.” (C. 516.)
 

 The trial court cited
 
 Ex parte Taylor,
 
 808 So.2d 1215 (Ala.2001), in which the trial court overrode the jury’s recommended sentence of life in prison without parole upon its finding that the aggravating circumstances outweighed the mitigating circumstances. One of the reasons the trial court in
 
 Taylor
 
 gave for justifying its override of the recommended sentence was that “ ‘some jurors’ outbursts of emotion after they found the defendant guilty of capital murder indicated that they were overwhelmed by their impending duty to consider the death penalty as required by law.’ ” (C. 515, quoting
 
 Taylor,
 
 808 So.2d at 1219.) The trial court in this case noted that the Alabama Supreme Court had found that to be a permissible justification for override and quoted the Supreme Court’s opinion in
 
 Taylor
 
 that the trial court “ ‘permissibly assessed [the jury’s recommendation] very little weight.’ ” (C. 515, quoting
 
 Taylor,
 
 808 So.2d at 1219.)
 

 We do not read the trial court’s citation of
 
 Taylor
 
 in its sentencing order as an indication that it had given “little weight” to the jury’s recommendation, as Harris contends. In fact, the trial court explicitly stated that it considered the jury’s recommendation to be the strongest mitigating circumstance in this case. Instead, the trial court quoted
 
 Taylor
 
 as authority for the proposition that a trial court may properly take into account the role jurors’ emotions or other factors may have played in the jury’s deliberations when the jury has recommended a sentence that is incongruous with the balance between aggravating and mitigating circumstances. In such a circumstance, the trial court may see if there is a valid justification for that incongruity and then take that justification into account when considering the weight to give the jury’s recommendation when the trial court does its own weighing of aggravating and mitigating circumstances.
 

 Because the record does not reflect that the trial court gave “little weight” to the jury’s recommended sentence, this issue is without merit.
 

 B.
 

 Harris also claims that the trial court’s decision to override the jury’s recommendation denigrates the role of the jury. Specifically, Harris asks this court to review whether it is “constitutionally tolerable” for the trial court to “ascribe ‘little weight’ ” to a jury’s recommendation that a defendant found guilty of capital murder be sentenced to life in prison without parole. (Appellant’s brief at 40.)
 

 
 *902
 
 As discussed above, the trial court in this case did not ascribe little weight to the jury’s recommendation. Furthermore, the trial court relied upon an opinion of the Alabama Supreme Court in finding that it could consider certain factors when determining the appropriate weight to ascribe to the jury’s recommendation. We are bound by the decisions of the Alabama Supreme Court, and this court “is without authority to overrule the decisions of [that] court.”
 
 Jones v. City of Huntsville,
 
 288 Ala. 242, 244, 259 So.2d 288, 290 (1972). See § 12-3-16, Ala.Code 1975; and
 
 Brown v. State,
 
 [Ms. CR-04-0293, June 29, 2007] — So.3d-,-(Ala.Crim.App.2007).
 

 C.
 

 Harris claims that Alabama’s sentencing scheme allowing judicial override of jury recommendations in capital cases violates equal protection and due process considerations in that it has no standard or norm, resulting in arbitrary sentencing of defendants convicted of capital crimes. The Alabama Supreme Court has thoroughly considered this argument and rejected it. See
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002), cert. denied, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003);
 
 Ex parte Taylor,
 
 808 So.2d 1215 (Ala.2001); and
 
 McGowan v. State,
 
 990 So.2d 931 (Ala.Crim.App.2003).
 

 In rejecting the argument, the Alabama Supreme Court explained its reasoning as follows:
 

 “Section 13A-5-47, Ala.Code 1975, provides that the trial judge must order and receive a detailed, written, pre-sentence investigation report; must permit the parties to present arguments concerning aggravating and mitigating circumstances and the proper sentence to be imposed; and must enter specific written findings regarding the existence or nonexistence of each and every aggravating circumstance and mitigating circumstance offered by the parties. § 13A-5-47(b)(d), Ala.Code 1975. Section 13A-5-47(e) further provides that the trial judge must ‘determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist.’ In weighing the aggravating and mitigating circumstances, ‘the trial court shall consider the recommendation of the jury contained in its advisory verdict.’
 
 Id.
 
 We conclude that this capital-sentencing procedure ensures that the trial judge is given adequate information and sufficient guidance in deciding whether to accept or to reject a jury’s recommended sentence. See
 
 Eddings v. Oklahoma,
 
 455 U.S. [104], 111, 102 S.Ct. 869 [(1982)].
 

 “The Supreme Court held in
 
 Harris [v. Alabama,
 
 513 U.S. 504 (1995),] that the United States Constitution ‘permits the trial judge, acting alone, to impose a capital sentence’ and ‘is ... not offended when a State further requires the sentencing judge to consider a jury’s recommendation and trusts the judge to give it the proper weight.’ 513 U.S. at 515, 115 S.Ct. 1031. We find this holding applicable to Taylor’s particular Fourteenth Amendment claim.
 

 “This Court held in
 
 Ex parte Jones,
 
 456 So.2d 380 (Ala.1984), that the Constitution of the United States does not require the ‘[adoption of] specific limitations on the trial court’s power to override the jury’s advisory verdict’ and that Alabama’s capital-sentencing procedure provides sufficient protection for capital defendants because ‘[t]he whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury’s recommendation’ of life imprisonment. 456 So.2d at 382. Under Alabama’s capital-
 
 *903
 
 sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties. § 13A-5-47(d), Ala.Code 1975. In making these findings, the trial judge must consider a jury’s recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala.Code 1975 (‘in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict’). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury’s recommendation the consideration he gave it.
 
 McCausland v. Tide-Mayflower Moving & Storage,
 
 499 So.2d 1378, 1382 (Ala.1986) (stating that subsections of a statute ‘should be construed together to ascertain the meaning and intent of each’). Therefore, we hold that Alabama’s capital-sentencing procedure does not result in the imposition of the death sentence in an arbitrary and capricious manner in violation of the Fourteenth Amendment.”
 

 Ex parte Taylor,
 
 808 So.2d at 1218-19 (footnote omitted).
 

 This issue has already been decided adversely to Harris.
 

 D.
 

 Harris also contends that judicial override of a jury’s recommendation of life imprisonment without parole violates
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 
 Ring
 
 applied the rule stated in
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that, “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.”
 

 This Court has specifically rejected Harris’s contentions that Alabama’s statutory scheme, allowing a trial court to override a jury’s recommendation of a sentence of life imprisonment without parole upon a defendant’s conviction for capital murder, is unconstitutional.
 

 In
 
 Brownfield v. State,
 
 [Ms. CR-04-0743, April 27, 2007] — So.3d-(Ala.Crim.App.2007), we noted that in a number of opinions decided in the aftermath of
 
 Ring,
 
 both this Court and the Alabama Supreme Court concluded that
 
 Ring
 
 did not invalidate Alabama’s death-penalty statute. See, e.g.,
 
 Ex parte Hodges,
 
 856 So.2d 936 (Ala.2003);
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Duke v. State,
 
 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert, granted, sentence of death vacated pursuant to
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005),
 
 Duke v. Alabama,
 
 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005);
 
 Turner v. State,
 
 924 So.2d 737 (Ala.Crim.App.2002);
 
 Stallworth v. State,
 
 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand).
 

 “In recognizing the narrowness of the United States Supreme Court’s holding in
 
 Ring,
 
 this Court has noted that although ‘[t]he
 
 Ring
 
 Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt,’ the
 
 Ring
 
 Court ‘did not reach the question whether judicial sentencing or judicial override was constitutional.’
 
 Stallworth v. State,
 
 868 So.2d [1128] at 1183 [ (Ala.Crim.App.2001) ] (opinion on return to second remand). Further:
 

 “ ‘ “Ring’s claim is tightly delineated: He contends only that the Sixth
 
 *904
 
 Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge
 
 Almendarez-Torres v. United States,
 
 528 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 490-91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting ‘the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation’ (citation omitted [in
 
 Ring
 
 ])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See
 
 Proffitt v. Florida,
 
 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) (‘[I]t has never [been] suggested that jury sentencing is constitutionally required.’). He does not question the Arizona Supreme Court’s authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See
 
 Clemons v. Mississippi,
 
 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See
 
 Apprendi,
 
 530 U.S., at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Fourteenth Amendment ‘has not ... been construed to include the Fifth Amendment right to “presentment or indictment of a Grand Jury” ’).” ’
 

 “Stallworth v. State,
 
 868 So.2d at 1183-84 (quoting
 
 Ring,
 
 536 U.S. at 597 n. 4).
 

 “As the Alabama Supreme Court stated in
 
 Ex parte Waldrop:
 

 “ ‘[T]he weighing process is not a factual determination. In fact, the relative “weight” of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, “While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.”
 
 Ford v. Strickland,
 
 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which “the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.”
 
 Tuilaepa v. California,
 
 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See
 
 Harris v. Alabama,
 
 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting “the notion that ‘a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required’ ” (quoting
 
 Franklin v. Lynaugh,
 
 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that “the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer”).
 

 “ ‘Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or
 
 *905
 
 legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See
 
 California v. Ramos,
 
 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (“Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury[ ] then is free to consider a myriad of factors to determine whether death is the appropriate punishment.”);
 
 Zant v. Stephens,
 
 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (“sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does”).
 

 “ ‘In
 
 Ford v. Strickland,
 
 supra, the defendant claimed that “the crime of capital murder in Florida includes the element of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.”
 
 Ford,
 
 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit rejected this argument, holding that “aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sen-tencer’s discretion in a structured way after guilt has been fixed.” 696 F.2d at 818. Furthermore, in addressing the defendant’s claim that the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant’s argument
 

 “ ‘ “seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see
 
 State v. Dixon,
 
 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and
 
 State v. Johnson,
 
 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.”
 

 “ ‘696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit’s rationale. See
 
 Lawhorn v. State,
 
 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (“while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party”); see also
 
 Melson v. State,
 
 775 So.2d 857, 900-901 (Ala.Crim.App.1999);
 
 Morrison v. State,
 
 500 So.2d 36, 45 (Ala.Crim.App.1985).
 

 “ ‘Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently,
 
 Ring
 
 and
 
 Apprendi
 
 do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.’
 

 “Ex parte Waldrop,
 
 859 So.2d [1181] at 1189-1190 [ (Ala.2002) ] (footnote omitted).”
 

 Brownfield,
 
 — So.3d at-.
 

 The jury convicted Harris of two counts of murder during a burglary, a violation of § 13A-5^0(a)(4), Ala.Code 1975, and of
 
 *906
 
 the murder of two or more people during the same course of conduct or pursuant to one scheme, a violation of § 13A-5-40(a)(10). Therefore, the statutory aggravating circumstances of committing a capital offense during the commission of a burglary, § 13A-5-49(4), Ala.Code 1975, and intentionally causing the death of two or more people pursuant to one scheme or course of conduct, § 13A-5^t9(9), Ala. Code 1975, were “provfen] beyond a reasonable doubt.” § 13A-5-45(e), Ala.Code 1975; see also § 13A-5-50, Ala.Code 1975. Only one aggravating circumstance must exist in order to impose a sentence of death. § 13A-5-45(f), Ala.Code 1975. Thus, the jury, and not the trial judge, determined the existence of the “aggravating circumstance necessary for imposition of the death penalty” for Harris. See
 
 Ring,
 
 536 U.S. at 609, 122 S.Ct. 2428. Therefore, the findings reflected in the jury’s verdict alone exposed Harris to a range of punishment that had the death penalty as its maximum.
 

 Because this issue has been rejected in previously decided cases, Harris is not entitled to relief as to this issue.
 

 E.
 

 Harris further contends that instructing the jury that its verdict during the penalty phase of a capital case is advisory or merely a recommendation runs afoul of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However,
 

 “ ‘Alabama courts have repeatedly held that a prosecutor’s comments and a trial court’s instructions accurately informing a jury that its sentencing verdict is advisory or is a recommendation do not violate
 
 Caldwell [v. Mississippi
 
 472 U.S. 320 (1985)]. E.g.,
 
 Ray v. State,
 
 809 So.2d 875, 883 (Ala. Crim.App.2001), and cases cited therein.’
 

 “Deardorff v. State,
 
 [Ms. CR-01-0794, June 25, 2004] - So.3d -, - (Ala.Crim.App.2004).”
 

 Brown v. State,
 
 [Ms. CR-04-0293, June 29, 2007]-So.3d-,-(Ala.2007).
 

 This issue, too, has already been decided adversely to Harris.
 

 IV.
 

 Harris contends that the trial court improperly admitted collateral evidence of prior bad acts, i.e., that he had physically abused Janice Ball and that he had not paid any child support for their daughter, Shay. Harris objected to the admission of that evidence at trial.
 

 Whether to admit collateral evidence as proof of motive or intent is a matter within the sound discretion of the trial court. See
 
 Key v. State,
 
 891 So.2d 353, 365-66 (Ala.Crim.App.2002).
 

 Rule 404(b), Ala. R. Evid., provides for the exclusion of evidence of prior bad acts generally. Rule 404(b) provides, in pertinent part:
 

 “Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....”
 

 In
 
 Robinson v. State,
 
 528 So.2d 343 (Ala.Crim.App.1986), this Court explained the purpose behind the general exclusionary rule.
 

 “ ‘ “ ‘On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his
 
 *907
 
 bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.’ ” “ ‘This exclusionary rule is simply an application of the character rule, which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” Thus, the exclusionary rule serves to protect the defendant’s right to a fair trial. “ ‘The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.’ ”
 

 “ ‘If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.’ The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. ‘ “Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.” ’ ‘ “ ‘Prejudicial’ is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.” [Citation omitted.] “Of course, ‘prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.’ ” ’ ”
 

 Robinson,
 
 528 So.2d at 347 (citations omitted). See also Charles W. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 69.01 (5th ed.1996).
 

 In this case, prosecutors elicited evidence tending to show that Harris did not pay child support to help Janice with the costs of raising Shay. On the Friday before the murders, which were committed on a Monday, Harris and Janice Ball began arguing over Harris’s refusal to repay Janice money he had borrowed from her, which she said she needed to buy diapers. Their argument escalated into a physical altercation during which Harris slapped Janice. Janice responded by hitting him with a telephone. Janice told Harris to get his things and leave the trailer where she, Harris and Shay had been staying. She said that Harris had been violent and controlling before, and she was tired of it.
 

 Harris left the Ball farm. He called Janice twice over the weekend asking
 
 *908
 
 whether Janice’s family intended to press charges against him, then came to the Ball farm on Sunday evening to speak with Janice. Janice testified that her family came to her aid when Harris came to the house. Mila Ruth Ball called Willie Has-lip, Janice’s father, to tell him Harris was on the front porch of the house where she and Janice were living. Haslip and his sons — Janice’s brothers — came out of their trailer carrying shotguns. Harris had already left Janice’s house, but Haslip yelled into the night for Harris to go home before he got hurt. The murders began the next morning, when Harris came into the house and killed Mila Ruth. He then killed each member of the Ball family as the day progressed.
 

 “Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the
 
 res gestae
 
 of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term
 
 ‘res gestae
 
 ’ because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the ‘complete story’ of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
 

 “Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute ‘other crimes, wrongs, or acts’ as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that
 
 rute'
 
 — i.e., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.”
 

 C. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 69.01(3) (5th ed.1996) (footnotes omitted); see also
 
 Smoot v. State,
 
 381 So.2d 668, 671 (Ala.Crim.App.1980); and
 
 King v. State,
 
 595 So.2d 539, 541 (Ala.Crim.App.1991).
 

 Woods v. State,
 
 [Ms. CR-05-0448, August 31, 2007] - So.3d - (Ala.Crim.App.2007), is analogous to this case. In
 
 Woods,
 
 the defendant was convicted of capital murder in the shooting deaths of four Birmingham police officers. During the course of his trial, several witnesses testified that Woods and another defendant were operating a drug business out of their apartment. There also was testimony that Woods had numerous guns in the apartment. Counsel also mentioned Woods’s drug business in their arguments.
 

 Woods objected to the admission of the testimony on the ground that the evidence of his drug activity and about his guns “was improper character evidence and was inherently prejudicial.”
 
 Id.
 
 at-. This Court found that the evidence at issue was admissible, explaining,
 

 “the testimony of those three witnesses and the others who testified about the drug sales and gun possession, in addition to counsel’s arguments, established that drug sales and weapons were part
 
 *909
 
 of the
 
 res gestae
 
 or the continuous transaction of events in this case. Furthermore, the testimony established Woods’s motive and intent, which were primary issues in the trial.”
 

 Id.
 

 In this case, evidence of the argument between Janice and Harris over his refusal to help her pay for diapers for their daughter, the escalation of the argument into a physical altercation, and evidence that Janice was tired of their fights and was therefore asking Harris to leave are part of a continuous transaction — the “complete story” — to explain what happened at the Ball farm on August 26, 2002.
 

 The evidence also provided a motive as to why Harris killed Janice’s family, i.e., he was angry at being turned away; and it rebutted Harris’s defense that he was acting as Janice’s “savior,” freeing her from a father and brothers who had allegedly sexually abused her.
 

 The evidence also tended to rebut Harris’s assertions that he carried out the crime because was being manipulated by Janice. His refusal to pay child support, or even to give Janice money when she needed to buy diapers for their daughter, tends to show that he was going to do what he wanted, regardless of Janice’s needs or wishes.
 

 The evidence of Harris’s prior bad acts was admissible under the
 
 res gestae
 
 exception to the general exclusionary rule of character evidence.
 
 Woods,
 
 supra; see also
 
 Johnson v. State,
 
 [Ms. CR-99-1349, March 11, 2005] — So.3d-(Ala.Crim.App.2005), rev’d on other grounds,
 
 Johnson v. State,
 
 [Ms. 1041313, October 6, 2006] —- So.3d- (Ala.2006) (evidence of bigamy and adulterous relationships introduced in capital murder defendant’s trial was admissible because, “[although those acts were not strictly a part of the
 
 res gestae
 
 of the murder, they tended to explain and relate to the killing; those acts were part of a continuous transaction wherein the murder became the culmination of all of the circumstances. While somewhat peripheral, those acts were all links in the chain of events culminating in the murder.”).
 
 [3]
 

 We note that in his brief on appeal, Harris also contends that the limiting instruction given to the jury that evidence of Harris’s prior bad conduct could not be considered as substantive evidence that he had committed the crimes with which he was charged was insufficient. Instead, Harris argues, the trial court should have told jurors that the evidence of prior bad conduct was inadmissible for
 
 any
 
 purpose and, therefore, should not be considered at all. This argument is plainly without merit. As demonstrated above, however, the evidence was admissible for several reasons, including informing the jury of the “complete story,” rebutting Harris’s defenses that he acted out of a belief that he was Janice’s savior, on the one hand, or that he was being manipulated by Janice, on the other. Accordingly, the trial court’s limiting instruction regarding the proper use of the prosecution’s evidence of Harris’s prior bad conduct was proper.
 

 V.
 

 Harris contends that the trial court improperly instructed the jury in several in
 
 *910
 
 stances, thereby denying him a fair trial and a reliable verdict. The following alleged errors were not raised at trial. Therefore, we review them for plain error. See Rule 45A, Ala. R.App. P.
 

 Rule 45A, Ala. R.App. P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 In the context of challenged jury instructions, the plain-error doctrine has been applied as follows.
 

 “ ‘ “In setting out the standard for plain error review of jury instructions, the court in
 
 United States v. Chandler,
 
 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited
 
 Boyde v. California,
 
 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’
 
 Williams v. State,
 
 710 So.2d 1276, 1306 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” ’
 

 “Broadnax v. State,
 
 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting
 
 Pilley v. State,
 
 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, ‘[wjhen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.
 
 Ingram v. State,
 
 779 So.2d 1225 (Ala.Cr.App.1999).’
 
 Johnson v. State,
 
 820 So.2d 842, 874 (Ala.Crim.App.2000).”
 

 Snyder v. State, 893
 
 So.2d 488, 548 (Ala.Crim.App.2003); see also
 
 Belisle v. State,
 
 [Ms. CR-02-2124, March 2, 2007] — So.3d-,-(Ala.Crim.App.2007).
 

 A.
 

 Harris asserts that the trial court erred when it failed to instruct the jury that intoxication could negate the specific intent required to sustain a conviction for capital murder.
 

 The record shows that the trial court did instruct the jury on each of the lesser-included offenses to capital murder, including reckless manslaughter. The trial court explained that to find reckless manslaughter in this case, the jury would have to find that Harris recklessly caused the death of each victim by shooting them with a shotgun or pistol, as the case may be. The court instructed the jury that “a person acts recklessly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial unjustifiable risk that the result will occur and that the circumstances exist.” (R. 9108; 9202.) The court continued:
 

 “A
 
 person who creates a risk but is unaware thereof solely by reason of voluntary intoxication acts recklessly with respect thereto. Voluntary means intoxication caused by substance that the actor knowingly introduced into his body the tendency of which causes intoxication he knows or ought to know unless he introduces them under circumstances that would afford a defense to a charge of crime.”
 

 (R. 9108-09; 9202-03.) Harris contends on appeal that the court’s charge omitted a vital part of the law regarding intoxication in that it “did not inform the jury that intoxication that vitiates specific intent was a defense to murder.” (Appellant’s brief at 53.)
 

 
 *911
 
 “A charge on intoxication should be given if ‘ “there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt”’ in the element of intent.
 
 Coon v. State,
 
 494 So.2d 184, 187 (Ala.Crim.App.1986) (quoting
 
 Government of the Virgin Islands v. Carmona,
 
 422 F.2d 95, 99 n. 6 (3d Cir.1970)). See also
 
 People v. Perry,
 
 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) (‘[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis’). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting,
 
 Owen v. State,
 
 611 So.2d 1126, 1128 (Ala.Crim.App.1992);
 
 Crosslin v. State,
 
 446 So.2d 675, 682 (Ala.Crim.App.1983), where the defendant denies the commission of the crime,
 
 Coon v. State,
 
 494 So.2d at 187; see
 
 Moran v. State,
 
 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see
 
 Owen v. State,
 
 611 So.2d at 1127-28.”
 

 Pilley v. State,
 
 930 So.2d 550, 561-62 (Ala.Crim.App.2005).
 

 However, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent.
 
 Ex parte McWhorter,
 
 781 So.2d 330, 342 (Ala.2000). In
 
 Pilley
 
 this Court provided guidance as to what evidence would be required to form that evidentiary foundation.
 

 “The Alabama Legislature has defined ‘intoxication’ to include ‘a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.’ § 13A-3-2(c)(l), Ala. Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. ‘[TJhere must be evidence that the ingestion caused a disturbance of the person’s mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.’
 
 Lee v. State,
 
 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also
 
 Maples v. State,
 
 758 So.2d 1, 23 (Ala.Crim.App.), aff'd 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court’s opinion in
 
 Windsor v. State,
 
 683 So.2d 1027, 1037 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we stated:
 

 “ ‘In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no “reasonable theory” to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.’ ”
 

 Pilley,
 
 930 So.2d at 563.
 

 Despite Harris’s contention to the contrary in his brief on appeal, whether he was intoxicated when the murders were committed was not an issue at trial. The only mention of Harris’s use of drugs or
 
 *912
 
 alcohol came during Janice Ball’s testimony. She said that while she and Harris were driving around Crenshaw County
 
 after
 
 the murders, Harris asked her whether she was going to call the police. She didn’t respond to him. She described what Harris did next:
 

 “And he had took some, something white out of his pocket and it was a little plastic bag. He had took a bill, like a dollar bill, whatever he had and he had rolled the money up. He was sticking it in there and put whatever was in there and sniffed it, drugs, I don’t know what type of drugs it was.”
 

 (R. 7529.)
 

 The prosecutor asked Janice whether she’d seen him “do that before.” (R. 7529.) Janice said that she had, but the prosecutor did not pursue the matter to determine when she had seen Harris do it. There was no testimony at trial' as to whether Harris had been drinking or doing drugs earlier in the day, while the murders were being committed. In fact, Dr. Karl Kirkland, a forensic psychologist who interviewed Harris for competency issues before trial, reported that Harris denied using any drugs or alcohol at the time of the offense. (SR. 9679.) There is insufficient evidence from which a jury could find beyond a reasonable doubt that Harris was experiencing' “a disturbance of mental or physical capacities” resulting from drug or alcohol use at the time of the murders.
 

 Harris failed to establish the requisite evidentiary foundation of intoxication that would merit an instruction on intoxication. The trial court mentioned voluntary intoxication while it was defining the lesser-included offense of manslaughter for the jury, but there was no evidence presented that would support a theory that Harris could not form the requisite intent to commit capital murder because he was intoxicated at the time the murders were committed.
 

 “Under § 13A-l-9(b), Ala.Code 1975, a trial judge is not required to instruct on a lesser-included offense ‘unless there is a rational basis for a verdict convicting the defendant of the included offense.’ ”
 
 Pilley,
 
 930 So.2d at 563. Because there was no rational basis for an instruction on the effect intoxication may have had on Hams’s intent to commit murder, the trial court did not err in refusing to instruct the jury that intoxication could negate specific intent.
 

 B.
 

 Harris contends that the trial court improperly instructed the jury on reasonable doubt. He did not object to the reasonable doubt charge at trial; therefore, we review this argument for plain error.
 

 The trial court instructed the jury on reasonable doubt as follows:
 

 “I have used the term ‘reasonable doubt’ on several occasions in my charge. The phrase is sometimes self-explanatory to a degree. And the efforts to clarify it do not always clarify the term but it may help you some to say that a reasonable doubt must be a substantial doubt. A reasonable doubt is not a mere guess or surmise. It is a doubt based on reason and logic and not upon speculation.
 

 “If, after considering all the evidence in the case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant.
 

 “The reasonable doubt which entitled an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt but a reasonably substantial
 
 *913
 
 doubt, one arising from the evidence or from the lack of evidence. And it would be one that would remain after careful consideration of the testimony, such as reasonable, fair-minded and conscientious people like yourselves would entertain under all of the circumstances.
 

 “Now, the State is not required to convince you of the defendant’s guilt beyond all doubt or to a mathematical certainty or beyond a shadow of a doubt but simply beyond all reasonable doubt.
 

 “If, however, after comparing and considering all of the evidence in the case your minds are left in such a condition that you cannot say that you have an abiding conviction of the defendant’s guilt then you are not convinced beyond a reasonable doubt and in such an event the defendant would be entitled to an acquittal at your hands.”
 

 (R. 9085-87.)
 

 Without an explanation as to why, Harris takes umbrage with the trial court’s use of the phrase “abiding conviction,” and its statements that the doubt must not be based on “guess or surmise” but on “reason and logic,” that the jury need not be convinced to a “mathematical certainty,” and that a reasonable doubt is not a “fanciful, vague, conjectural or speculative doubt.” He also asserts that the trial court’s instruction that the “reasonable doubt which entitles an accused to an acquittal” “implicitly distinguishes] between a reasonable doubt which does entitle a defendant to an acquittal and one that does not.” (Appellant’s brief at 55.) Harris contends that the latter instruction im-permissibly lowered the State’s burden of proof in violation of
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
 

 In
 
 Cage v. Louisiana,
 
 the United States Supreme Court held that a court’s use of the three phrases “grave uncertainty,” “actual substantial doubt,” and “moral certainty” to define reasonable doubt would cause a reasonable juror to believe that the State’s burden of proof was lesser than what is actually necessary to convict.
 
 Cage,
 
 498 U.S. at 41, 111 S.Ct. 328.
 

 The instruction on reasonable doubt that the trial court provided to the jury here incorporated the language found in the Alabama Pattern Jury Instructions on reasonable doubt. The pattern jury instructions inform jurors that their doubt cannot be based on “a mere guess or surmise” but must be based on “reason and common sense.” It also informs jurors that reasonable doubt that “entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt.”
 
 Alabama Pattern Jury Instructions: Criminal,
 
 Instructions 1.4 and 1.5 (3d ed.1994). “‘“A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.” ’
 
 Wilson v. State,
 
 777 So.2d 856 (Ala.Crim.App.1999), quoting
 
 Price v. State,
 
 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).”
 
 Snyder v. State,
 
 893 So.2d 488, 550 (Ala.Crim.App.2003).
 

 Further, this court previously has upheld instructions informing the jury that reasonable doubt does not mean that the State must convince the jury of the defendant’s guilt “to a mathematical certainty.”
 
 Brown v. State,
 
 [Ms. CR-04-0293, June 29, 2007] — So.3d-,-(Ala.Crim.App.2007);
 
 Belisle v. State,
 
 [Ms. CR-02-2124, March 2, 2007] — So.3d-,-(Ala.Crim.App.2007); and
 
 Reuther v. City of Leeds,
 
 599 So.2d 1246, 1250 (Ala.Crim.App.1992).
 

 Likewise, this court has upheld instructions informing the jury that if it had an “abiding conviction of the truth of the
 
 *914
 
 charge then it was convinced beyond a reasonable doubt,” determining that such language did not violate
 
 Cage. Belisle,
 
 — So.3d at-, and
 
 Stallworth v. State,
 
 868 So.2d 1128, 1164 (Ala.Crim.App.2001).
 

 The trial court’s instruction on reasonable doubt was thorough and accurate. Because the language the trial court used in instructing the jury on reasonable doubt was based upon the pattern jury instructions and language this court has determined does not violate
 
 Cage,
 
 we hold that there was no error, plain or otherwise, in the trial court’s instruction to the jury regarding reasonable doubt.
 

 C.
 

 At trial, Harris did raise the issue that the trial court improperly instructed the jury that before it considered lesser-included offenses, it should first consider the capital murder charge, then the lesser-included offenses, then finally to consider whether Harris was innocent. Harris maintains that the instruction implied that a capital conviction was the proper verdict and impermissibly interfered with the jury’s function as the finder of fact.
 

 When reviewing a trial court’s jury instructions, this Court keeps in mind the following principles:
 

 “A trial court has broad discretion when formulating its jury instructions. See
 
 Williams v. State,
 
 611 So.2d 1119, 1123 (Ala.Crim.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’
 
 Self v. State,
 
 620 So.2d 110, 113 (Ala.Crim.App.1992) (quoting
 
 Porter v. State,
 
 520 So.2d 235, 237 (Ala.Crim.App.1987)); see also
 
 Beard v. State,
 
 612 So.2d 1335 (Ala.Crim.App.1992);
 
 Alexander v. State,
 
 601 So.2d 1130 (Ala.Crim.App.1992).”
 

 Williams v. State,
 
 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001).
 

 The record shows that the trial court instructed the jury on the elements of the charged offenses of capital murder and then the elements of the lesser-included offenses as they related to each victim. After the court completed its charge to the jury as to the applicable law, it then went over the verdict forms with the jury. The forms began with capital murder at the top, working down through the lesser-included charges. In explaining the form, the trial court said, “I put them in this order because naturally below would be for you to consider the higher offense and gradually work down.” (R. 9150.)
 

 The court told the jury that if it found that the State had proven all of the elements of the charged offenses, it would be the jury’s duty to convict Harris of those charged offenses. If, however, after considering the evidence the jury found the State had not proven one or more of the elements of the charged offenses, then it would be the jury’s duty to find Harris not guilty of those offenses and consider the lesser-included offenses.
 

 Harris cites no authority for the proposition that it is improper for a jury to first consider the charged offenses and work its way down the list of lesser-included offenses if it finds that the State has not met its burden of proof as to the higher offenses. There has been no Alabama case addressing the issue. Research did, however, reveal several opinions of Ohio appellate courts discussing the propriety of a jury instruction requiring the jury to first consider the charged offense before considering any lesser-included offenses.
 
 State v. Thomas,
 
 40 Ohio St.3d 213, 533 N.E.2d 286 (1988);
 
 State v. Franklin,
 
 97
 
 *915
 
 Ohio St.3d 1, 776 N.E.2d 26 (2002); and
 
 State v. Coe,
 
 153 Ohio App.3d 44, 790 N.E.2d 1222 (4 Dist.2003). In those cases, the Ohio courts held that a trial court may instruct a jury that it should consider the charged offense first, as long as it does not require the jury that it must
 
 unanimously
 
 acquit the defendant of the greater offense before it may consider the lesser-included offenses.
 

 “In
 
 Thomas,
 
 the Ohio Supreme Court held that while ‘[a] jury must unanimously agree that the defendant is guilty of a particular criminal offense before returning a verdict of guilty on that offense,’ the jury need not unanimously agree that the defendant is not guilty of the crime charged before considering a lesser included offense.
 
 [State v. Thomas,
 
 533 N.E.2d 286 (Ohio 1988) ]. Rather, the court stated that if the jury is unable to agree on a verdict with respect to the greater offense, it may consider the lesser offense.
 
 Id.
 
 Thus, a jury instruction does not constitute an improper acquittal-first instruction if the instruction does not require unanimous acquittal on the crime charged before the jury may consider the lesser included offense. See
 
 id.; State v. Allen
 
 (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675.
 

 “In
 
 Thomas,
 
 the Ohio Supreme Court determined that the following jury instruction did not constitute an improper acquittal-first instruction:
 

 “ ‘If you find that The State has proven beyond a reasonable doubt all of the essential elements of the crime of aggravated murder, then your verdict must be that the Defendant is guilty of aggravated murder; and you will not consider the lesser offense.
 

 “ ‘However, if you find that The State has failed to prove beyond a reasonable doubt the element of prior calculation and design, then your verdict must be that the Defendant is not guilty of aggravated murder.
 

 “ *You will then proceed with your deliberations and decide whether The State has proven beyond a reasonable doubt all of the essential elements of the lesser crime of murder.’
 
 Id.
 
 at 220, 434 N.E.2d 1356, 24 O.O.3d 150.”
 

 Coe,
 
 790 N.E.2d at 1229-30.
 

 Like the jury instruction that met with approval by the Ohio appellate courts, the instruction given by the trial court in this case did not require the jury to unanimously find Harris was not guilty before moving on to consider lesser-included offenses. Instead, the jury was instructed that if it found the State had not proven one or more elements of the charged offenses, it was then to consider the lesser-included offenses.
 

 A review of Alabama cases shows that having the jury consider the charged offense before moving on to consider lesser-included offenses is not unusual, if not the norm. See, e.g.,
 
 Bradley v. State,
 
 925 So.2d 232, 237-38 (Ala.2005);
 
 Davis v. State,
 
 740 So.2d 1115, 1126 (AIa.Crim.App.1998);
 
 Madison v. State,
 
 718 So.2d 90, 95 (Ala.Crim.App.1997);
 
 Stiles v. State,
 
 500 So.2d 1190, 1199 (Ala.Crim.App.1985); and
 
 Lindsey v. State,
 
 456 So.2d 383, 388 (Ala.Crim.App.1983).
 

 In this case, the trial court simply provided the jury with an efficient way to consider the verdict forms. If the jury found that the State proved all of the elements of the higher offense — that is, the offense expressly stated in the indictment — then it would not have to consider the lesser-included offenses. It defies common sense to instruct a jury to consider whether a defendant was guilty of a lesser-included offense first, then go on to determine whether a higher offense also had been proven and so on up the chain of
 
 *916
 
 offenses to the charged offense, rendering the earlier findings moot. For example, a jury might find all of the elements of intentional murder were proven beyond a reasonable doubt, but such a finding would not eliminate the possibility that capital murder was not also proven beyond a reasonable doubt; thus, the jury’s inquiry would have to continue. If, on the other hand, the jury first determined that the State had proven each of the elements of a capital offense, it would not have need to consider the lesser-included offenses.
 

 The trial court’s instruction to the jury that it should consider the capital murder offenses first and consider the lesser-included offenses only if it found that the State had failed to prove an element of capital murder did not imply that capital murder was the “proper verdict,” as Harris contends. The instruction simply provided the jury with an efficient way to consider the possible verdicts against Harris in this case involving multiple charges concerning multiple victims. The trial court did not abuse its discretion in instructing the jury to consider lesser-included offenses after it had considered the charged offense.
 

 VI.
 

 Harris contends that the trial court improperly denied his motion to dismiss, which was based on double-jeopardy considerations. Harris’s first trial ended in a mistrial after defense counsel, prosecutors and the trial court were made aware that, while the first trial was underway, Harris took part in a three-way conversation during which one of the parties to the conversation said she had spoken to — or in front of — three jurors hearing Harris’s case and one had told her “it will always be a hung jury.” (R. 4397.)
 

 Upon learning of the conversation, the trial court held an evidentiary hearing, which included testimony from Theresa Rogers, one of the parties to the conversation, and each of the jurors hearing the case. Rogers testified that one of the jurors, Willie Johnson, came to her house and the two of them discussed the trial. Rogers said they talked about the lies they thought were being told by witnesses. She also said that Johnson told her there “ ‘wasn’t enough evidence to be presented enough. [Sic.] The jury is going to be hung.’ ” (R. 4440.) She also said she had spoken to two other jurors about the case when she saw them in town. One of those jurors, Rogers said, also overheard Rogers speaking with a friend about all the lies that were being told during the trial.
 

 The jurors were also individually questioned. The trial court asked each of them whether they had had any conversations about the case or overheard any conversations about the case contrary to the court’s instructions.
 

 After the hearing and arguments by counsel, the trial court determined that there had been improper communications that amounted to jury tampering that may have resulted in potential misconduct by the jury. As a result the trial court granted a mistrial.
 

 A.
 

 Harris contends that the trial court prematurely concluded that the jurors who had been exposed to alleged jury tampering could not retain their impartiality. Thus, he says, there was no manifest necessity to grant the mistrial. As a result, Harris asserts that his second trial on the same charges that were the subject of the trial that ended in a mistrial violated double-jeopardy principles.
 

 We first note that the grant or denial of a mistrial is a matter within the sound discretion of the trial court, and its
 
 *917
 
 ruling will be disturbed only if an abuse of that discretion is shown.
 
 Minor v. State,
 
 914 So.2d 372 (Ala.Crim.App.2004);
 
 Brasher v. State,
 
 555 So.2d 184 (Ala.Crim.App.1988).
 

 In
 
 Ex parte Head,
 
 958 So.2d 860 (Ala.2006), the Alabama Supreme Court addressed the issue of when double-jeopardy considerations are implicated after a court orders a mistrial.
 

 “The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense.
 
 United States v. Dinitz,
 
 424 U.S. 600, 606, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (footnote omitted). The Fifth Amendment provides: ‘No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb.... ’ U.S. Const, amend. V. See also
 
 Arizona v. Washington,
 
 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (‘A State may not put a defendant in jeopardy twice for the same offense.’). The underlying policy of this constitutional principle is that
 

 “ ‘the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.’
 

 “Green v. United States,
 
 355 U.S. 184, 187-88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).
 

 “Although the Double Jeopardy Clause affords this protection, it ‘does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding.’
 
 Oregon v. Kennedy,
 
 456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). ‘If the law were otherwise, “the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.”’
 
 Id.
 
 (quoting
 
 Wade v. Hunter,
 
 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).
 

 “Where, as here, a mistrial has been declared over the defendant’s objection, the defendant’s ‘valued right to have his trial completed by a particular tribunal’ is also implicated.
 
 Wade,
 
 336 U.S. at 689, 69 S.Ct. 834. When a trial is terminated over the defendant’s objection, the State may proceed with a retrial only after showing that the initial proceeding was aborted because of a ‘manifest necessity.’
 
 Kennedy,
 
 456 U.S. at 672, 102 S.Ct. 2083;
 
 Ex parte Sullivan,
 
 779 So.2d 1157, 1162 (Ala.2000). As the Supreme Court of the United States has noted: ‘The “manifest necessity” standard provides sufficient protection to the defendant’s interests in having his case finally decided by the jury first selected while at the same time maintaining “the public’s interest in fair trials designed to end in just judgments.” ’
 
 Kennedy,
 
 456 U.S. at 672, 102 S.Ct. 2083 (quoting
 
 Wade,
 
 336 U.S. at 689, 69 S.Ct. 834). However, the Supreme Court has held that a ‘high degree’ of necessity is required before a mistrial is appropriate.
 
 Washington,
 
 434 U.S. at 506, 98 S.Ct. 824.
 

 “ ‘The concept of “manifest necessity” does not lend itself to rigid application, and requires a due regard for the facts and circumstances of each case.’
 
 Huss v. Graves,
 
 252 F.3d 952, 955 (8th Cir.2001) (citing
 
 Washington,
 
 434 U.S. at 506, 98 S.Ct. 824). In this case-by-case inquiry, a reviewing court may consider whether the trial court acted
 
 *918
 
 in the defendant’s best interests. See
 
 Gori v. United States,
 
 367 U.S. 364, 369, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (‘Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial.’). Another relevant consideration is whether alternatives to a mistrial were explored. See
 
 United States v. Jorn,
 
 400 U.S. 470, 487, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (noting the trial court’s failure to consider a continuance as an alternative to mistrial);
 
 Ex parte Tribble,
 
 783 So.2d 69, 72 (Ala.2000) (‘[A] mistrial should be granted only as a last resort “where it is apparent that justice cannot be afforded” otherwise.’). Further, the reviewing court will consider whether the defendant has been given an opportunity to explain his position on the declaration of a mistrial.
 
 Huss,
 
 252 F.3d at 955 (citing
 
 Washington,
 
 434 U.S. at 515-16, 98 S.Ct. 824). A final consideration is whether the declaration of a mistrial denied the defendant the right to ‘retain primary control of the course to be followed’ in the event of an error at trial.
 
 Dinitz,
 
 424 U.S. at 609, 96 S.Ct. 1075.
 

 “The trial court thus must take ‘all circumstances into account’ in deciding whether a manifest necessity for declaring a mistrial exists.
 
 Illinois v. Somerville,
 
 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (citing
 
 Wade,
 
 336 U.S. at 691, 69 S.Ct. 834). The trial court has broad discretion in deciding whether to declare a mistrial.
 
 Somerville,
 
 410 U.S. at 462, 93 S.Ct. 1066.
 

 “ ‘Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant’s consent and even over his objection, and he may be retried consistently with the Fifth Amendment.’
 

 “Gori, 367 U.S. at 368, 81 S.Ct. 1523.”
 

 Ex parte Head,
 
 958 So.2d 860, 865-867 (Ala.2006).
 

 During Harris’s first trial on the charges arising from the murders of the Ball family and Haslip, the trial court learned of a three-way telephone conversation among Harris and two friends. During that conversation, which was recorded by jail officials, Harris’s friend Rogers assured him that she had spoken to one of the jurors, who told her there was not sufficient evidence to convict Harris and there would be a hung jury.
 

 The trial court conducted a hearing, during which Rogers
 
 [4]
 
 testified that she had talked with juror W.F.J. about the lies being told in the trial. Rogers said the conversation with juror W.F.J. took place at her house. Two other jurors were present when she talked with others about the trial as she did errands in town. One of the jurors, who was shopping at the same grocery store as Rogers, walked off, Rogers said.
 

 After Rogers testified, the trial court spoke individually with each juror hearing the case to determine the extent, if any, to which they had heard anything about the case outside of the courtroom. W.F.J. de
 
 *919
 
 nied going to Rogers’s house to speak with her.
 
 [5]
 

 After the hearing the trial court weighed the option of dismissing certain members of the jury, but determined that if it did so, there would not be a sufficient number of jurors to deliberate. The court then granted a mistrial on the grounds of jury tampering and of having too few jurors to deliberate.
 

 “ ‘ “[T]he granting of a mistrial in cases of private communications between jurors and third persons is largely within the discretion of the trial judge, and his decision is subject to reversal only where that discretion has been abused.” ’
 
 Cox v. State,
 
 394 So.2d 103, 105 (Ala.Crim.App.1981), quoting Woods
 
 v. State,
 
 367 So.2d 974, 980 (Ala.Crim.App.), rev’d on other grounds, 367 So.2d 982 (Ala.1978). ‘In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion “where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark.” ’
 
 Holland v. State,
 
 588 So.2d 543, 546 (Ala.Crim.App.1991), quoting
 
 Bascom v. State,
 
 344 So.2d 218, 222 (Ala.Crim.App.1977).
 

 “ ‘ “Any communication or contact outside the jury room about the matters at trial between a juror and another person is forbidden where that contact ‘might have unlawfully influenced that juror.’ ” ’
 
 Knox v. State,
 
 571 So.2d 389, 390-91 (Ala.Crim.App.1990), quoting
 
 Ebens v. State,
 
 518 So.2d 1264, 1267 (Ala.Crim.App.1986), quoting in turn
 
 Roan v. State,
 
 225 Ala. 428, 435, 143 So. 454, 460 (1932).”
 

 Minor v. State,
 
 914 So.2d 372, 412 (Ala.Crim.App.2004).
 

 In
 
 Woods v. State,
 
 367 So.2d 982 (Ala.1978), the Alabama Supreme Court upheld the decision of the trial court granting a mistrial after the defendant’s mother was seen in conversation with one of the jurors. “The fact that a juror who knew the defendant was seen by the court conversing with the defendant’s mother was sufficient to raise a presumption of vitiating influence.”
 
 Woods,
 
 367 So.2d at 984. In affirming the trial court’s order granting the mistrial, the Court wrote, “It is the trial court’s duty to preserve the impartiality of the jury. Even the appearance of impropriety may infect public respect for the verdict.
 
 United States v. Hewitt,
 
 517 F.2d 993 (3rd Cir.1975).”
 
 Id.
 

 This case involved a juror who, in the midst of the trial, came to the home of a known friend of Harris’s and agreed with the friend that witnesses in Harris’s trial were lying. The juror told Harris’s friend that the case would end with a hung jury because the State could not present sufficient evidence to convict Harris. In light of the evidence adduced at the hearing, the integrity of any verdict the jury returned would be questionable. Furthermore, “ ‘the ends of public justice would ... be defeated’ if the trial were to proceed.”
 
 Head,
 
 958 So.2d at 869, quoting
 
 United States v. Perez,
 
 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).
 

 Because of the broad discretion given to the trial court in deciding whether to declare a mistrial, we conclude that the evidence was sufficient to support a finding of manifest necessity justifying a mistrial in this case.
 

 
 *920
 
 B.
 

 Harris also contends that, pursuant to Rule 15.4, Ala. R.Crim. P., and
 
 Oregon v. Kennedy,
 
 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), he was entitled to a jury trial to determine whether the prosecution’s actions provoked a request for a mistrial. Harris correctly asserts that Rule 15.4 and
 
 Kennedy
 
 allow for a jury to be empaneled to determine the factual question of whether the prosecutor’s actions in the first trial were intended to provoke a mistrial. See also
 
 State v. Darling,
 
 878 So.2d 323, 326 (Ala.Crim.App.2003). However, in granting the mistrial the trial court made clear that its decision was based upon jury tampering and on the fact that there would be too few jurors to deliberate the case.
 

 There was no basis for a belief that the mistrial was granted because of any improper behavior by the prosecution. Instead, the mistrial clearly was granted because of juror misconduct. Thus, Harris was not entitled to a jury trial on the issue of the propriety of the mistrial.
 
 Darling,
 
 878 So.2d at 326. Accordingly, the trial court properly denied Harris’s request to empanel a jury to determine whether the prosecution acted in a way intended to provoke a mistrial.
 

 VII.
 

 Harris contends that prosecu-torial misconduct deprived him of a fair trial and a reliable sentence. In support of his contention, Harris cites six instances of what he claims to be prosecutorial misconduct.
 

 “ ‘ “ ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.
 
 Whitlow v. State,
 
 509 So.2d 252, 256 (Ala.Crim.App.1987);
 
 Wysinger v. State,
 
 448 So.2d 435, 438 (Ala.Crim.App.1983);
 
 Carpenter v. State,
 
 404 So.2d 89, 97 (Ala.Crim.App.1980), cert. denied, 404 So.2d 100 (Ala.1981).’ ”
 

 “
 
 ‘Callahan v. State,
 
 767 So.2d 380, 392 (Ala.Crim.App.1999). For an argument by counsel to amount to reversible error it must “have so infected the trial with unfairness, taken in the context of the whole trial, that the appellant is entitled to a new trial. See
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181 (1986).”
 
 Holladay v. State,
 
 629 So.2d 673 (Ala.Crim.App.1992), cert. denied, 510 U.S. 1171 (1994).’
 

 “[Davis v. State,]
 
 494 So.2d [851] at 853 [(Ala.Crim.App.1986)].”
 

 Calhoun v. State,
 
 932 So.2d 923, 962 (Ala.Crim.App.2005).
 

 A.
 

 Harris first asserts that the State improperly argued irrelevant and prejudicial “prior-bad-act” evidence during its closing arguments. Specifically, Harris takes exception to the prosecution’s reference to his failure to support his daughter, Shay; to the fact that he had physically abused Janice; and to the fact that he was 19 years old and Janice was 14 when “the defendant got Janice pregnant.” (R. 9053.) Such arguments, Harris contends, improperly implied that he was guilty of being an abusive partner and of committing statutory rape.
 

 It is axiomatic that a prosecutor may legitimately argue facts in evidence and, further, that a prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel.
 
 DeBruce v. State,
 
 651 So.2d 599, 609 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
 

 
 *921
 
 “ ‘ “ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ ”
 
 Reeves v. State,
 
 807 So.2d 18, 45 (Ala.Crim.App.2000), quoting
 
 Rutledge v. State,
 
 523 So.2d 1087, 1100 (Ala.Crim.App.1987) (citation omitted), rev’d on other grounds, 523 So.2d 1118 (Ala.1988).
 

 “1 “ ‘The test of a prosecutor’s legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument.
 
 Kirkland v. State,
 
 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper.
 
 Henley v. State,
 
 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.
 
 Williams v. State,
 
 377 So.2d 634 (Ala.Crim.App.1979);
 
 McQueen v. State,
 
 355 So.2d 407 (Ala.Crim.App.1978).’ ”
 

 ‘“Ballard v. State,
 
 767 So.2d 1123, 1135 (Ala.Crim.App.1999), writ quashed, 767 So.2d 1142 (Ala.2000), quoting
 
 Watson v. State,
 
 398 So.2d 320, 328 (Ala.Crim.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).’
 

 “Johnson v. State,
 
 823 So.2d 1, 47 (Ala.Crim.App.2001). Moreover, as this Court explained in
 
 Minor v. State,
 
 914 So.2d 372 (Ala.Crim.App.2004):
 

 “ ‘ “ ‘[T]he propriety of argument of counsel to the jury depends upon the particular issues, fact, and atmosphere of each case.’ ” ’
 
 McNair v. State,
 
 653 So.2d 320, 339 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting
 
 Bryson v. State,
 
 264 Ala. 111, 114, 84 So.2d 785, 788 (1955).
 

 “ ‘ “This court has held on many occasions that in order to determine whether a statement of the prosecutor was improper, ‘it must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor’s argument was an answer.’
 
 Washington v. State,
 
 259 Ala. 104, 65 So.2d 704 (1953);
 
 Gibson v. State,
 
 347 So.2d 576 (Ala.Crim.App.1977);
 
 Rutledge v. State,
 
 [482 So.2d 1250] (Ala.Crim.App.1983). The rule in Alabama is that ‘remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused’s counsel and are in reply to or retaliation for his acts and statements.’
 
 Shewbart v. State,
 
 33 Ala. App. 195, 32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244 (1947);
 
 Camper v. State,
 
 384 So.2d 637 (Ala.Crim.App.1980);
 
 Wilder v. State,
 
 401 So.2d 151 (Ala.Crim.App.), cert. denied, 401 So.2d 167 (Ala.1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981);
 
 Miller v. State,
 
 431 So.2d 586 (Ala.Crim.App.1983);
 
 Rutledge,
 
 supra.”
 

 “
 
 ‘Henderson v. State,
 
 460 So.2d 331, 333 (Ala.Crim.App.1984). “ ‘When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.’ ”
 
 Davis v. State,
 
 494 So.2d 851, 855 (Ala.Crim.App.1986), quoting DeFoor,
 
 Prosecutorial Misconduct in Closing Argument,
 
 7 Nova L.J. 443, 469 (1982-83).’
 

 “914 So.2d at 424-25.”
 

 Brooks v. State,
 
 973 So.2d 380, 397-98 (Ala.Crim.App.2007).
 

 
 *922
 
 As discussed in Part IV above, evidence of Harris’s failure to pay child support and his physical altercations with Janice was properly admitted to give the jury the complete picture of what transpired in the days before the murders of the Ball family and Haslip. Prosecutors were entitled to use that evidence to paint for the jury a picture of how they believe the murders came about.
 

 As to the prosecution’s statement that Harris “got Janice pregnant,” such a statement constituted a reply in kind to Harris’s insinuations and assertions that Janice manipulated him and convinced him to kill the Balls and Haslip to protect her from the abuse she said she’d suffered at the hands of her father and brother. During closing arguments, Harris’s attorneys insinuated that Janice had pursued a relationship with Harris in an effort to leave home. Harris intimated that Janice became pregnant to stay in that relationship.
 

 In reply to Harris’s assertion, one of the prosecutors told the jury that at age 14, Janice was a child, and that “in [the prosecutor’s] book, [Harris] got her pregnant.” (R. 9053.) The prosecutor acknowledged that Janice did have some responsibility in their relationship, but that at 19, Harris was the one controlling the relationship, and he was not subject to manipulation by Janice, as he alleged.
 

 Because the comments to which Harris takes exception were legitimate inferences drawn from the evidence presented at trial, and because those comments were made in reply to the inferences Harris had drawn from the evidence, the comments were not improper.
 

 B.
 

 Harris contends that the prosecutor improperly shifted the burden to Harris to prove his innocence by claiming that Harris had failed to show any evidence establishing his innocence. Specifically, Harris contends that the prosecution improperly argued that when Janice was testifying, Harris never asked whether she shot any members of her family. Such an argument, he says, invited the jury to convict him because he had not shown that someone else had committed the murders.
 

 Harris’s defense in this case was that he did not act alone, and that, in fact, he did not kill all of the people he was accused of murdering. The defense raised the possibility that Janice had been the instigator of the murders or even had taken part in the actual killings of certain members of her family.
 

 During their closing arguments, to refute Harris’s insinuations, one prosecutor stated, “Notice how they never said — never asked Janice did you shoot any of them? Never asked her. Never have said who shot the five [sic]. You know why? Because they know. They just want to put the octopus defense on you.” (R. 9068.)
 

 In
 
 Minor v. State,
 
 914 So.2d 372 (Ala.Crim.App.2004), this Court was called upon to review similar comments made by the prosecutor. In
 
 Minor,
 
 the defendant raised the possibility that, while he was out of the house and his girlfriend had gone to wash clothes, a third person may have entered his house and murdered his child. During closing arguments, the prosecution pointed out that the defense attorney never asked whether the girlfriend left the house to do laundry, insinuating that the defense knew she had not done so.
 
 Minor,
 
 914 So.2d at 423.
 

 This court held that the comment was a legitimate comment on the lack of evidence to support the defendant’s theory as to how his child was killed.
 
 Id. “
 
 ‘Rather than shifting the burden of proof, the statement constitute^] an effort to meet the prosecutor’s own burden of proof by
 
 *923
 
 commenting on the lack of evidence.’ ”
 
 Id.
 
 quoting
 
 Miles v. State,
 
 715 So.2d 913, 917 (Ala.Crim.App.1997) (holding that the prosecutor’s reference during closing arguments to the defense’s failure to question a certain witness was a permissible comment on the lack of evidence to support the defendant’s testimony).
 

 Likewise, in this case, the prosecution’s comments regarding Harris’s failure to question Janice about whether she had taken part in the killings of the Ball family and Haslip were a permissible comment on the lack of evidence that would support Harris’s theory. The comments did not shift of the burden of proof.
 

 C.
 

 Harris also asserts that the prosecution accused the defense of lying and trying to deceive the jury. Specifically, Harris takes exception to the following comments made by prosecutors during their closing arguments:
 

 “[I]t is the defendant’s job to try to get you to take your eye off the ball. It is the defense attorney’s job to make sure that they can throw up as much cloud of silt—
 

 [Objection made and overruled.]
 

 “It is the defense attorney’s job, ladies and gentlemen of the jury, to protect their client to the degree that they can throw up as much sand and much smoke and as much silt as they can to try to cloud that water to get you to take your eye off that ball. Then you won’t be able to come back with a fair and just verdict.”
 

 (R. 8967-68.)
 

 “I don’t care how good they are. I don’t care how well [Harris] can lie. They cannot turn a duck into an elephant and that’s [their] case. There is none. There’s none, never been one. We’ve had to sit here for three weeks and listen to this gobbledy gook because that is our system.”
 

 (R. 9069.)
 

 Arguments with similar language and of similar tone have been upheld on the rationale that they are not direct attacks on the integrity of defense counsel but were comments on the lack of evidence. In
 
 Minor v. State,
 
 914 So.2d 372 (Ala.Crim.App.2004), the prosecutor said in argument, “[B]ut let me tell you who does blow smoke in the courtroom in every case, that’s defense attorneys and that’s the cloud of smoke they raise with one red herring after another.”
 
 Id.
 
 at 423. This court found that the comment was not improper because, “when viewed in context, it is clear that the prosecutor was again merely commenting on the lack of evidence to support Minor’s theory that [his girlfriend] or someone else other than Minor had killed [Minor’s child].”
 
 Id.
 

 “ ‘One of the most prevalent arguments to a jury is that the position and argument of the adversary is unwarranted, silly, fanciful or illogical.’
 
 Crook v. State,
 
 276 Ala. 268, 270, 160 So.2d 896, 897 (1963). ‘[A] prosecutor’s remarks during closing argument pointing out the flaws in the defense’s theory of the case do not constitute improper argument.’
 
 Reeves v. State,
 
 807 So.2d 18, 45 (Ala.Crim.App.2000). See also
 
 Hall v. State,
 
 820 So.2d 113, 142 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001) (prosecutor’s reference to the defense as a ‘smoke screen’ was not improper) (emphasis omitted);
 
 West v. State,
 
 793 So.2d 870, 884 (Ala.Crim.App.2000) (prosecutor’s comment that a statement made by defense counsel was ‘part of the fairy tale that /all have been hearing from the defense side’ was not improper or prejudicial) (emphasis omitted);
 
 Woodall v. State,
 
 730 So.2d 627, 650 (Ala.
 
 *924
 
 Crim.App.1997), aff'd in pertinent part, rev’d on other grounds, 730 So.2d 652 (Ala.1998) (prosecutor’s comment that defense’s theory was ‘an attempt to sell the jury “oceanfront property in Arizona” ’ was not improper or prejudicial);
 
 Smith v. State,
 
 588 So.2d 561, 569 (Ala.Crim.App.1991) (prosecutor’s reference to defense counsel . as ‘ “merchants of reasonable doubt” ’ was not improper);
 
 Haywood v. State,
 
 501 So.2d 515, 519 (Ala.Crim.App.1986) (prosecutor’s comment that. ‘ “devious tricks to distort the truth” ’ had occurred during the trial was not improper);
 
 Thomas v. State,
 
 393 So.2d 504, 508-09 (Ala.Crim.App.1981) (prosecutor’s comments ‘ “Judge, I think this lawyer needs to have a little lesson in proper evidence” ’ and that trial counsel had ‘ “lied” ’ were not prejudicial); and
 
 Crook,
 
 276 Ala. at 269, 160 So.2d at 896-97 (prosecutor’s comments ‘ “You don’t listen to some new fangled, disgusting theory that springs out from the minds of the imaginative lawyers” ’ and ‘ “We aren’t supposed to tamper around with any kind of disgusting new fangled theory” ’ were not improper) (emphasis omitted).”
 

 Minor,
 
 914 So.2d at 423-24.
 

 Based upon the cited authorities, we hold that the comments at issue were not improper.
 

 D.
 

 Harris contends that prosecutors improperly argued to the jury during the penalty phase of the trial that he should be executed to send a message to others. Specifically, he takes exception with the prosecutor’s exhortation to jurors to recommend the death penalty for Harris to show that “we will not tolerate this type of lawless behavior” and “mayhem.” (R. 9507.) Prosecutors also asked the jury to return a verdict recommending that Harris receive the death penalty “for the citizens of Alabama,” “for the citizens of Crenshaw County,” and for the Ball family. (R. 9507.)
 

 This Court has consistently held that urging the jury to return a verdict so as to punish crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument.
 
 Living v. State,
 
 796 So.2d 1121, 1140 (Ala.Crim.App.2000); see also
 
 Sockwell v. State,
 
 675 So.2d 4, 35 (Ala.Crim.App.1993);
 
 Freeman v. State,
 
 776 So.2d 160 (Ala.Crim.App.1999).
 

 “ ‘Retribution is a proper subject of prosecutorial argument.
 
 Perkins v. State,
 
 808 So.2d 1041 (Ala.Crim.App.1999);
 
 McWilliams v. State,
 
 640 So.2d 982, 1001 (Ala.Crim.App.1991), aff'd in pertinent part, rem’d, 640 So.2d 1015 (Ala.1993). See also
 
 Price v. State,
 
 725 So.2d 1003, 1033 (Ala.Crim.App.1997) (there is no impropriety in a prosecutor’s appeal to the jury for justice);
 
 Kuenzel v. State,
 
 577 So.2d 474, 498 (Ala.Crim.App.1990) (retribution is a valid consideration in sentencing) (quoting
 
 Johnson v. Wainwright,
 
 778 F.2d 623, 630 (11th Cir.1985)), aff'd, 577 So.2d 531 (Ala.1991).’
 

 “Smith v. State,
 
 [Ms. CR-97-1258, December 22, 2000] — So.3d --, --- (Ala.Crim.App.2000), rev’d in part on other grounds, [Ms. 1010267, March 14, 2003] — So.3d-(Ala.2003).”
 

 Ex parte Walker,
 
 972 So.2d 737, 746-47 (Ala.2007).
 

 Based on the authorities cited, we hold that the comments at issue were not improper.
 

 E.
 

 Harris- asserts that the appearance by .Alabama Attorney General Troy King at the sentencing hearing before the
 
 *925
 
 trial court gave the appearance of improper political pressure being placed upon the trial court to override the jury’s verdict recommending that Harris be sentenced to life in prison without the possibility of parole. During his statement to the trial court at the sentencing hearing, Mr. King said,
 

 “Your Honor, I would submit to you today the eyes of Alabama are upon this Court and upon this county. Those victims, those who love justice in your state and those who will test our resolve, our resolve to hold them to account when they engage in brutality such as that willed [here].”
 

 (R. 9578.)
 

 Harris asserts that the political pressure Mr. King’s appearance placed upon the trial court denied him his right to due process. In support of his contention, Harris cited the United States Supreme Court opinion in
 
 In re Murchison,
 
 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), which stated, “Every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.” Harris asserts that Mr. King’s remarks to the trial court “could be seen as pointing out a political cost to the court if it did not favor the state as it continued to seek Mr. Harris’s execution even after the jury rejected it.” (Appellant’s brief at 73.)
 

 The attorney general’s office, rather than the district attorney’s office, prosecuted this case. “It is the obligation of the attorney general and the district attorney to expose and prosecute crimes.”
 
 Dickerson v. State,
 
 414 So.2d 998, 1008 (Ala.Crim.App.1982), overruled on other grounds,
 
 Ex parte Bohannon,
 
 564 So.2d 854 (Ala.1988).
 

 “ ‘ “The attorney general is ... the chief law officer of the state, and on him are conferred various authorities and duties in connection with instituting and prosecuting, in the name of the state, suits and other proceedings ... for the preservation and protection of the rights and interests of the state.” ’
 
 Ex parte Weaver,
 
 570 So.2d 675, 679 (Ala.1990) (quoting
 
 State ex rel. Carmichael v. Jones,
 
 252 Ala. 479, 484, 41 So.2d 280, 284 (1949)) (emphasis added). See, e.g., Ala. Code 1975, § 36-15-21.”
 

 Chapman v. Gooden,
 
 974 So.2d 972, 988 (Ala.2007). As the State’s elected chief prosecutor, Mr. King was entitled to argue the State’s position during Harris’s sentencing hearing. To prohibit the state’s attorney general from personally carrying out the duties of his office would be to eviscerate the position.
 

 Furthermore, Harris provided no evidence to demonstrate that Mr. King’s personal appearance at the sentence hearing actually created a bias in the State’s favor or otherwise influenced the trial court to override the jury’s recommendation of a sentence of life imprisonment. As will be discussed in more depth in Part XIII below, the trial court’s stated reasons for its override of the jury’s recommended verdict were grounded in the law.
 

 Trial courts are presumed to know and to follow existing law.
 
 Stewart v. State,
 
 730 So.2d 1203, 1221 (Ala.Crim.App.1996). Nothing in the record indicates that the trial court considered anything aside from that which it was legally bound to consider, or that the trial court harbored any type of bias in reaching its decision to override the jury’s recommended verdict. See
 
 Reichert v. Wyoming,
 
 134 P.3d 268 (Wyo.2006) (mere allegation that the appearance of a state senator at defendant’s sentencing hearing improperly influenced the judge deemed
 
 *926
 
 insufficient to show judicial bias). There is no basis from which this court could infer that the trial court had a bias or prejudice that prevented it from fairly-imposing a sentence in this case.
 

 F.
 

 Harris asserts that the cumulative effect of each of the prosecution’s prejudicial arguments and misstatements of law require the reversal of his conviction. A new trial is necessary when the cumulative effect of prosecutorial misconduct adversely affects the substantial rights of the defendant and seriously affects the fairness and integrity of the judicial proceedings.
 
 Ex parte Tomlin,
 
 540 So.2d 668, 672 (Ala.1988).
 

 As discussed in Sections A through E above, we find that the prosecution’s arguments and the comments with which Harris took exception were not improper. Because we find that no single instance of the prosecutor’s conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on Harris’s trial is without merit. See
 
 Whitehead v. State,
 
 777 So.2d 781, 832 (Ala.Crim.App.1999); and
 
 Melson v. State,
 
 775 So.2d 857 (Ala.Crim.App.1999).
 

 VIII.
 

 Harris contends that the pretrial “death-qualification” process produced a jury prone to convict him, in violation of his right to an impartial jury. This issue has previously been decided adversely to Harris.
 

 “The United States Supreme Court in
 
 Lockhart v. McCree,
 
 476 U.S. 162 (1986), held that the United States Constitution does not forbid a capital defendant’s potential jury from being ‘death qualified’ and that to do so does not deprive a defendant of his constitutional right to an impartial jury. 476 U.S. at 173. Alabama has followed the holding in
 
 Lockhart v. McCree.
 
 See
 
 Johnson v. State,
 
 823 So.2d 1 (Ala.Crim.App.2001);
 
 Clemons v. State,
 
 720 So.2d 961 (Ala.Crim.App.1996).”
 

 Blackmon v. State,
 
 [Ms. CR-01-2126, August 5, 2006] — So.3d -, - (Ala.Crim.App.2005) (opinion on application for rehearing). Accordingly, we find no error.
 

 IX.
 

 Harris contends that the use of elements of capital murder offenses as aggravating circumstances violated his right to not be twice placed in jeopardy for the same offense. This issue has previously been settled adversely to Harris by both the Alabama Legislature and the courts of this state.
 

 In
 
 Stewart v. State,
 
 730 So.2d 1203, 1226-27 (Ala.Crim.App.1996), this Court addressed this issue as follows:
 

 “Section 13A-5-50 clearly provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is specified in § 13A-5-49. Furthermore, this court has repeatedly held that the use of an element of capital murder as an aggravating circumstance does not implicate the Double Jeopardy Clause because it does not punish a defendant twice for the same offense.
 
 Burton v. State,
 
 651 So.2d 641 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
 

 “ ‘ “This practice, known as ‘double counting’ or ‘overlapping,’ has been upheld.
 
 Haney v. State,
 
 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993);
 
 Kuenzel [v. State,
 
 577 So.2d 474, 489 (Ala.Cr.App.1990),
 
 *927
 
 aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) ].
 

 “ ‘ “Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
 

 “ ‘ “ ‘The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5^19 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’
 

 “ ‘ “Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense.
 
 Kuenzel,
 
 supra; see also
 
 Ex parte Kennedy,
 
 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
 

 “1 “ ‘A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy.’
 

 “ ‘
 
 “Kuenzel,
 
 577 So.2d at 488, quoting
 
 Fortenberry v. State,
 
 545 So.2d 129, 142 (Ala.Crim.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).’
 

 “
 
 ‘Burton,
 
 651 So.2d at 657-58.’ ”
 

 “Hutcherson v. State,
 
 677 So.2d 1174, 1201 (Ala.Crim.App.1994), rev’d, 677 So.2d 1205 (Ala.1996).”
 

 See also
 
 Jones v. State,
 
 946 So.2d 903, 928 (Ala.Crim.App.2006); and
 
 Peraita v. State,
 
 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003).
 

 Harris’s argument is without merit.
 

 X.
 

 Harris argues that a document from the State Department of Forensic Sciences (“DFS”) reporting on its analysis of DNA evidence collected at the scene of the murders did not meet the high standards for admission of DNA evidence because, Harris says, the report was altered after the forensic examiner spoke with prosecutors. Therefore, he contends, the report should not have been admitted into evidence.
 

 “ ‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’
 
 Taylor v. State,
 
 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’
 
 Ex parte hoggins,
 
 771 So.2d 1093, 1103 (Ala.2000).”
 

 Gavin v. State,
 
 891 So.2d 907, 963 (Ala.Crim.App.2003).
 

 The record in this case shows that DFS scientist Phyllis Rollan issued a report stating that a stain on the heel of Harris’s shoe was found to have a mixture of DNA, containing DNA that was consistent with that of Harris, John Ball and Janice Ball.
 

 After issuing the report, Rollan spoke with prosecutors in the case. She subsequently issued a revised report stating that the stain contained a mixture of DNA consistent with that of Harris and John Ball, but excluded mention of Janice Ball. Harris asserts that Rohan’s report and testimony “was potentially compromised under pressure and was thus too unrelia
 
 *928
 
 ble to be admitted at a capital trial.” (Appellant’s reply brief at 38.)
 

 Rollan testified that she changed her report regarding the components of the stain on the shoe because Janice Ball’s DNA was a “minor component” of the stain, and Rollan was uncomfortable that in further analysis, Janice’s DNA could not be duplicated, and her DNA did not appear in a second sample taken from the stain. The amendment of her report had nothing to do with her discussion with prosecutors.
 

 In determining whether DNA evidence is admissible, trial courts are to assess the reliability or validity of the evidence. In making their assessment, courts should use the flexible analysis set forth in
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which employs the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
 
 Blackmon v. State,
 
 [Ms. CR-01-2126, August 5, 2005] — So.3d-,-(Ala.Crim.App.2005); and
 
 Turner v. State,
 
 746 So.2d 355, 361 (Ala.1998).
 

 We note that Harris does not challenge the methods by which Rohan performed the analysis of the stain, nor does he challenge the scientific validity of the results of the analysis. Instead, he claims that because Rollan spoke with prosecutors and subsequently amended her findings, her report “may be compromised.” No evidence supports his claim; it is based solely on speculation and conjecture. Indeed, Rohan explained that the reason for the change in her report was that she was unable to duplicate the initial findings, which included DNA consistent with that of Janice Bah in the mixture of DNA found in the stain on Harris’s shoe. No evidence contradicts her explanation.
 

 Harris presented no basis for exclusion of the DNA evidence. The trial court did not abuse its discretion in admitting the DNA results. This issue is without merit.
 

 XI.
 

 Harris argues that the cumulative effect of each of the above claims of error entitles him to a new trial and sentencing hearing under Alabama law and federal law. “ ‘Because we find no error in the specific instances alleged by the appellant, we find no cumulative error.’
 
 Lane v. State,
 
 673 So.2d 825 (Ala.Crim.App.1995). See also
 
 McGriff v. State,
 
 908 So.2d 961 (Ala.Crim.App.2000).”
 
 Calhoun v. State,
 
 932 So.2d 923, 974 (Ala.Crim.App.2005). We likewise find no cumulative error in this case.
 

 XII.
 

 Because Harris has been sentenced to death, this Court must review these proceedings for plain error. Rule 45A, Ala. R.App. P., states:
 

 “In ah cases in which the death penalty has been imposed, the Court of Criminal Appeals shah notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 When discussing the application of the plain-error standard of review, this Court has stated:
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
 
 *929
 
 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
 

 We have searched the record for any error that may have adversely affected Harris’s substantial rights. We found no plain error as to the guilt phase of his trial. See Rule 45A, Ala. RApp. P.
 

 XIII.
 

 Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Harris’s conviction and sentence of death. Section 13A-5-53, Ala.Code 1975, requires that we review the propriety of Harris’s death sentence to determine whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; whether the trial court’s findings concerning the aggravating and mitigating circumstances were supported by the evidence; and whether death is the appropriate sentence in the case. In determining whether death is the proper sentence, we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
 

 After evidence was presented to the jury during the penalty phase of Harris’s trial, the jury, by a vote of seven to five, recommended a sentence of life imprisonment without the possibility of parole.
 

 Pursuant to 13A-5-47, Ala.Code 1975, the trial court held a subsequent sentencing hearing to aid it in determining whether it would sentence Harris to death or to life imprisonment. In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Harris’s participation in it.
 

 In its findings, the trial court found the existence of the following statutory aggravating circumstances: (1) that Harris killed two or more people during one scheme or course of conduct; and (2) that Harris was engaged in the commission of a burglary at the time the capital offense was committed. The court noted that Harris had been convicted of four counts of murder made capital because the murders occurred during the commission of a burglary. The court found that because Harris went in and out of the houses sev
 
 *930
 
 eral times during the day, the evidence showed that each murder took place during a separate burglary. Accordingly, the court treated each instance as a separate aggravating factor. See
 
 Calhoun v. State,
 
 932 So.2d 923, 973 (Ala.Crim.App.2005).
 

 The trial court found the existence of one statutory mitigating circumstance, that is, that Harris had no prior significant criminal history. It further found a number of nonstatutory mitigating circumstances.
 

 The trial court acknowledged that, while Harris is not mentally retarded, he does possess below-average intelligence and mental capabilities. The trial court said that those factors do not excuse murder “as even persons with low intelligence know that murder is wrong” (C. 505), but it did give “some weight” to Harris’s low mental capabilities as a mitigating factor.
 

 The trial court also considered as a mitigating factor the fact that Harris suffered from migraines that may have been the result of a head injury Harris suffered as a child. The court also noted that Harris had had seizures, but that they were infrequent to the point of being “virtually nonexistent.” (C. 505.)
 

 The trial court also considered that Harris did not have a father figure early in his life, that he moved frequently as a child, and that he may have had problems with self-esteem. The court tempered this finding with the evidence that Harris had had loving relationships and friends during his childhood.
 

 The trial court considered as nonstatuto-ry mitigating factors Harris’s care for other people’s children, which included buying clothes for those children; evidence that Harris was a model prisoner; evidence that Harris attempted to be a family man (but that his dependent personality prevented him from doing so successfully); and Harris’s plea for mercy.
 

 The trial court stated that it considered the heaviest mitigating factor in this case to be the jury’s recommendation that Harris be sentenced to life in prison without the possibility of parole. In its order, the trial court outlined its reasons for overriding the jury’s verdict recommending a sentence of life without parole. It added that it had seen no case in which a defendant had killed six victims pursuant to one scheme or course of conduct. It cited a number of eases with multiple victims — all of which involved fewer than six victims— in which the trial courts overrode the juries’ recommendations for life in prison without the possibility of parole. In each ease, this Court upheld the trial courts’ decisions to override the juries’ recommendations. As the trial court pointed out, when compared with the fact of similar cases, a task the jury could not undertake, “the only disproportionate sentence in this case would be to sentence Harris to life without parole instead of death.” (C. 516.)
 

 The trial court’s sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Harris to death by lethal injection.
 

 Harris was convicted of four counts of murder made capital because he committed each murder during the course of a burglary, a violation of § 13A-5^0(a)(4), Ala.Code 1975, and one count of murder of two or more people during one scheme or course of conduct, a violation of § 13A-5-40(a)(10), Ala.Code 1975.
 

 
 *931
 
 Harris murdered six members of one family during the course of an entire day. He shot Mila Ruth Ball in the head as she was kneeling in her own kitchen, reciting the Lord’s Prayer. He shot Tony Ball while Tony was still in bed. Harris then lay in wait for each of the other members of the family to come home from work or school, shooting them one by one as they arrived home. Harris committed the murders in front of Janice Ball — the daughter, granddaughter, and sister of the people he killed — and his own daughter, Shay.
 

 The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-58(b)(l), Ala.Code 1975. Furthermore, after weighing independently the aggravating circumstances and the mitigating circumstances, this Court finds that the aggravating circumstances outweigh the mitigating circumstance, and we are convinced that death was the appropriate punishment in this case.
 

 As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Harris’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Harris committed four murders during the course of burglary and murdered two or more people pursuant to one scheme or course of conduct. Harris’s sentence was not disproportionate or excessive when compared to penalties imposed in similar cases. See
 
 Brown v. State,
 
 [Ms. CR-04-0293, June 29, 2007] — So.3d-(Ala.Crim.App.2007) (death appropriate penalty for defendant convicted of murder committed during the course of a robbery and burglary);
 
 Hall v. State,
 
 979 So.2d 125 (Ala.Crim.App.2007) (death appropriate penalty for defendant convicted of murder committed during the course of a burglary);
 
 Jones v. State,
 
 987 So.2d 1156 (Ala.Crim.App.2006) (death appropriate penalty for defendant convicted of murder committed during the course of a burglary);
 
 Apicella v. State,
 
 809 So.2d 841 (Ala.Crim.App.2000) (death appropriate penalty for defendant convicted of murdering five people pursuant to one scheme or course of conduct);
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002), cert. denied, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003) (death appropriate penalty for defendant convicted of murdering two people pursuant to one scheme or course of conduct);
 
 Ex parte Taylor,
 
 808 So.2d 1215 (Ala.2001) (death appropriate penalty for defendant convicted of murdering three people pursuant to one scheme or course of conduct); and
 
 McGowan v. State,
 
 990 So.2d 931 (Ala.Crim.App.2003) (death appropriate penalty for defendant convicted of murdering two people pursuant to one scheme or course of conduct).
 

 For the reasons set forth above, Harris’s conviction and sentence of death by lethal injection are affirmed.
 

 AFFIRMED.
 

 BASCHAB, P.J., and McMILLAN, SHAW, and WISE, JJ„ concur.
 

 [1]
 

 . In the original indictment, Westly Devone Harris’s name was misspelled. At a pretrial hearing, the trial court granted Harris's motion to correct the spelling from "Westley Devon Harris” to the spelling used here. (R. 4735.)
 

 [2]
 

 . A reviewing court may consider both the evidence presented at a pretrial suppression hearing and the evidence presented at trial when considering whether a trial court properly overruled a defendant’s motion to suppress.
 
 Ex parte Price,
 
 725 So.2d 1063, 1067 (Ala.1998).
 

 [3]
 

 . We note that the trial court also gave a limiting instruction during its charge to the jury directing jurors that the "testimony [about alleged misconduct of the defendant prior to the occurrence for which he is charged in this case] is not substantive evidence of the defendant’s guilt on the charges before you and cannot be considered as substantive evidence that the defendant committed offenses for which he is charged.” (R. 9090.)
 

 [4]
 

 . Rogers was subsequently convicted of jury tampering in Harris’s first case.
 
 State v. Rogers,
 
 Case Nos. DC-2004-790 and CC-2005-071, in the District and Circuit Courts of Crenshaw County, Alabama, respectively.
 

 [5]
 

 . W.F.J. was subsequently indicted for perjury.
 
 State v. Johnson,
 
 Case No. CC-2005-064, in the Circuit Court of Crenshaw County, Alabama.